[Civ. No. 19740. Second Dist., Div. Three. May 27, 1954.]

Y. FRANK FREEMAN, JR., Respondent, v. A. T. JERGINS et al., Appellants.

Hartke & Brant, Christian H. Hartke, Freeman R. Brant, and Clock, Waestman & Clock for Appellants.

Edmund G. Brown, Attorney General, and Ralph W. Scott, Deputy Attorney General, as Amici Curiae on behalf of Appellants.

Mitchell, Silberberg & Knupp and Arthur Groman for Respondent.

SHINN, P. J.—Plaintiff recovered judgment of $149,560.84 against A. T. Jergins, Lowell Stanley and Charles P. Cotton, as executor of the Last Will and Testament of Charles M. Cotton, deceased. The amount was determined to be the reasonable value of plaintiff's services in introducing one John W. Lee, a representative of Smith, Barney and Company, a New York investment partnership (hereinafter called Smith-Barney), to defendants Jergins, Stanley and the late Charles M. Cotton, under an express oral agreement by which the three last named agreed ". . . that if a sale of the stock of the Jergins Oil Company was effected through the efforts of said Lee or the said firm of Smith, Barney & Co., said defendants would pay to plaintiff for his services in finding and arranging an introduction of said Lee to said defendants, Jergins and Stanley, and to said C. M. Cotton, a reasonable

compensation, not only for the stock which stood in their own names but for that which they controlled and which they represented to be approximately 65 per cent of the outstanding stock of the Jergins Oil Company.'' Plaintiff was obligated to pay Robert Troutman, Jr., an attorney of Atlanta, one-half of the compensation which he might receive, Troutman having arranged for plaintiff to meet Lee. The stock of the Jergins Oil Company was sold to Lehman Brothers of New York for more than $30,000,000. Plaintiff demanded compensation, which defendants refused to pay. The present action was brought upon the express contract, and an additional common count, both seeking compensation in the amount of the reasonable value of the services rendered. Defendants Jergins, Stanley and Charles P. Cotton, as executor, appeal.

Preliminarily it may be mentioned that the young Mr. Freeman was in the ice cream business. Neither he nor Lee nor Smith-Barney was licensed as a broker in California; Smith-Barney first appeared in the capacity of a possible purchaser of the stock; later the firm was authorized by defendants to find a purchaser for the stock of the defendants and certain of their associates, with the understanding that all the stockholders would have the same opportunity to sell; numerous efforts in this direction were unsuccessful; thereafter Lehman Brothers purchased all the stock of the company. The court found that plaintiff had performed his agreement; that the Lehman Brothers purchase resulted from the efforts of Lee and Smith-Barney; that the shares of stock owned and controlled by the three defendants amounted to 35,483 shares, and that the same sold for $14,956,084, 1 per cent of which sum was awarded as a judgment against the three defendants.

The questions upon the trial were the following: (1) What contract, if any, was entered into between plaintiff and defendants? (Charles M. Cotton will be referred to as a defendant.) (2) Was the contract one which had an illegal purpose, namely, the rendition of services by unlicensed persons for which a broker's license was required under California law? (3) Did the activities of plaintiff in performance of his agreement amount to the rendition of services for which a permit was required? (4) Was the purchase by Lehman Brothers effected through the efforts of Lee or Smith-Barney? (5) Was Troutman an indispensable or a necessary party to the action? (6) Was the contract with plaintiff joint or several as to the defendants? (7) Was the action barred by the statute of frauds?

The court found that the contract was in terms as stated above and that it created a joint obligation of the defendants. Findings on all other issues were in favor of plaintiff.

There was not a great deal of conflict in the evidence as to the material facts. There were two principal factual questions, namely (1) as to the terms of the contract between plaintiff and defendants, and (2) whether the sale to Lehman Brothers resulted from the efforts of Lee or Smith-Barney. It is contended that the findings on these issues are without support in the evidence, and that all the other conclusions of the court on the material issues, factual or legal, were erroneous. There is an additional question, namely, did the court err in refusing to allow defense counsel to cross-examine Troutman under section 2055, Code of Civil Procedure, or to inspect certain letters passing between plaintiff and Troutman, and in refusing to permit the letters to be marked for identification?

In order to avoid repetition we shall state the facts which relate to the several contentions on the appeal as each contention is discussed.

There was evidence, consisting of the testimony of plaintiff. and certain of the defendants, as well, that plaintiff was promised compensation in an unsettled amount if he would arrange to introduce Lee to the defendants, and if, as a result of the efforts of Lee or Smith-Barney a sale of the stock was made. On behalf of Cotton it is said there was no evidence that he entered into such an agreement. Upon motion the testimony of the plaintiff, Jergins, Stanley and Troutman as to occurrences prior to the death of Cotton was stricken under section 1880(3), Code of Civil Procedure. There was other evidence, however, that Cotton was fully aware of the introduction of Lee by plaintiff and the purpose of it. He was present at the first meeting when Lee told defendants that Smith-Barney would not pay anything as compensation to plaintiff and Troutman and would prefer that the matter be not discussed in their presence. The court properly inferred that Cotton understood plaintiff was not acting as a mere volunteer but expected to receive some compensation from the three defendants to whom he introduced Lee. If no amount was agreed upon, nevertheless Cotton, as well as the other defendants, accepted and had the benefit of plaintiff's services, with knowledge of the purpose of the same. ■ In the absence of an agreement as to price the obligation of the recipient of services is to pay the reasonable value thereof. (27 Cal.Jur. 207, 208; *Muncy* v. *Thompson*, 26 Cal.App. 634 [147 P. 1178].)

There was undisputed evidence that plaintiff performed the agreement on his part, and evidence from which the court could properly conclude that the amount of plaintiff's compensation was not agreed upon. We therefore conclude there was substantial evidence that the parties entered into an agreement in terms as found by the court.

Defendant Jergins has filed briefs separate from those of his codefendants. They all assert invalidity of the contract with plaintiff, in that it called for services of plaintiff, Lee and Smith-Barney, for which they were required to be licensed under the Corporations Code, sections 25700-25713, and that the services rendered pursuant to the employment were such as are forbidden to unlicensed persons. Plaintiff replies that his agreement did not call for the services of a broker; that he was a mere ''finder,'' and as such was not required to have a broker's license; that he rendered no services as a broker; that his agreement with defendants did not require in its performance any services as brokers of himself or Lee or Smith-Barney; that if Smith-Barney undertook to or did act in the capacity of a broker it did not act as his agent, or in furtherance of his agreement with defendants.

In discussing this point additional facts must be stated. These may be taken from the findings which are, for the most part, merely a recital of evidentiary facts. In October, 1949, plaintiff learned from Troutman that he was in touch with people who were interested in buying valuable oil properties. He requested plaintiff to find properties for sale and promised plaintiff half of any commission he might receive. Plaintiff made inquiries of Bolsa Chica Oil Company and Russell Havenstrite, an independent operator, but was told that neither had anything to sell. Not having found any property for sale plaintiff made inquiry of Jergins in October or November, 1949, and he gave Jergins a letter which he had received from Troutman in order to show what his relations were with Troutman. In the following month he gave Jergins an additional memorandum he had received from Troutman and he offered to bring about an introduction to Troutman's people. Informed by Jergins that a sale of the Jergins Company stock would be considered, plaintiff went to Atlanta in December, 1949, and was informed that John W. Lee was representing Smith-Barney. In March, 1950, plaintiff telephoned Lee in Georgia, with the result that both Troutman and Lee came to Los Angeles, where plaintiff was introduced to Lee. In the meantime plaintiff had discussed

the matter of a possible sale with Jergins several times. Plaintiff, Troutman and Lee met with Jergins at a country club for lunch, following which they went to the home of Stanley, where Lee was introduced to Stanley and Cotton and disclosed his representation of Smith-Barney which firm, he said, would not look to the sellers for compensation in any deal that was made, and would not pay anything to Troutman or Freeman, to which Jergins stated "we will take care of Frank (plaintiff) and Troutman." Jergins had knowledge of the arrangement between plaintiff and Troutman for a division of compensation. In May, 1950, plaintiff met with defendants and the latter suggested $45,000 as compensation in the event a sale was made. Plaintiff refused to agree to this figure. (This evidence was stricken as to the estate of Cotton.) The next day Jergins informed plaintiff that defendants were willing to pay $65,000 or $72,000 (depending on the amount of stock sold), to which plaintiff refused to agree on behalf of himself and Troutman. Thereafter plaintiff was kept informed of the progress of the negotiations through telephone conversations with Troutman and Lee. Shortly after the first conference between Lee and the defendants plaintiff drove Lee to Long Beach, where the latter inspected the Jergins Trust Building, an asset of the oil company. Lee was in Los Angeles for about 10 days or two weeks, during which time plaintiff loaned him the use of an automobile, and he also drove Lee to the station when he left. In their several meetings they discussed the prospects of a sale. Lee investigated the California oil properties, upon which he reported to Smith-Barney, and he later went to Texas and inspected the Jergins properties there. After conferring with Lee, Smith-Barney sent their agent, Barten, to California where he was soon joined by Kenneth Hill of the petroleum department of the Chase National Bank and William B. Harding, a partner of Smith-Barney. After some time spent in a preliminary examination Hill, Harding and Lee left California, but Barton remained to obtain additional information. The investigation made by these gentlemen was comprehensive. During the progress of the investigation plaintiff met Barten and Hill and played golf with Hill at a country club. It was orally agreed between defendants and Barten, Hill and Harding that the investigation would be completed by the end of June, and that Smith-Barney would be allowed two weeks thereafter within which to bid, or organize a group to submit a bid for the Jergins Company stock. Barten made a lengthy report bearing date

of July 12, 1950. Smith-Barney endeavored to work out some deal for purchase of the stock by a group to be organized, or a single purchaser, but failed, and finally concluded that the best prospective purchaser was Signal Oil and Gas Company located in California. Lee obtained an extension of time from Jergins to about the middle of August, without disclosing the intention to submit the property to Signal. Barten, Lee, Hill and Bernet Walker, a partner of Smith-Barney, came to Los Angeles and conducted negotiations between Signal and defendants. No agreement was reached; other negotiations were had with The Capital Company and, following their termination, additional negotiations with Signal, all of which failed to bring about an agreement. All authority of Smith-Barney to proceed further was terminated by the defendants. Thereafter Lehman Brothers, learning of the failure of negotiations with Signal, contacted Chase National Bank and Smith-Barney and obtained extensive data and reports on the Jergins property. The events which followed up to the time Lehman. Brothers consummated the purchase are not pertinent to the present discussion and will be considered later in another connection.

First to be considered is the claim that the contract sued on was illegal in that it required plaintiff to act, and to have Lee and Smith-Barney act as brokers. The court found that Lee and Troutman were brought to Los Angeles following conversations between plaintiff and Jergins in which the latter stated that if plaintiff should find a person with whom Jergins could negotiate a deal he would pay plaintiff a reasonable compensation. The agreement with the three defendants, as found by the court, was entered into after Lee and Troutman came to Los Angeles. Under the original arrangement with Jergins plaintiff was merely given the privilege of finding a prospect. When the agreement with the three defendants was made plaintiff had already found and introduced the prospect. His services were ended. His compensation was not dependent upon his rendering any future service or engaging in any further activity. Neither Lee nor Smith-Barney was employed by defendants. There was no written agreement between them and defendants. Smith-Barney was presented to defendants and was considered as a prospective buyer. Although it appears that Smith-Barney had no intention of buying the property for itself, that fact was unknown to defendants until they learned of proposed negotiations with Signal. Lee represented to defendants that a

group composed of Smith-Barney and associates would consider purchasing the stock. It was not suggested in the negotiations with defendants that either plaintiff or Lee or Smith-Barney would act in the capacity of broker. Smith-Barney put out a brochure in New York in an endeavor to promote a purchase of the stock, by which it was proposed to form a new company with small capital, held entirely by Smith-Barney and associates, to act as purchaser. Such a corporation was eventually formed, owned by Lee and Smith-Barney with equal interests, but the corporation had no occasion to act in any capacity. The proposal was to have the new company take title to the stock and transfer it to the ultimate purchasers, who might or might not include Smith-Barney. The idea was for Smith-Barney to receive compensation as a capital gain, rather than as a broker's commission. All this was unknown to defendants, and it has no materiality except to explain the reason Lee represented to defendants that Smith-Barney was a prospective purchaser. It may be conceded for present purposes that Smith-Barney, in its endeavors in New York, might have made a sale in which it would have acted solely as a broker, but this would have been aside from anything it agreed with defendants to do or represented it would do, or which was expected of it by defendants. After the efforts to effect a purchase, conducted from New York, had failed Smith-Barney obtained another extension of time from defendants. When the negotiations with Signal became known to defendants they first learned that Smith-Barney proposed to act in the capacity of a broker, its compensation, if a sale were made, to come from the purchaser. Up to that time Smith-Barney had appeared to defendants as one who might either purchase the property itself or organize a group which would purchase it. There was nothing in the agreement between plaintiff and the defendants that would have required either plaintiff or Lee or Smith-Barney to act as a broker in any purchase that might be made. It is immaterial whether in the negotiations with Signal the firm was engaged in activities for which a license was required. Presentation of a proposal to an operating company had not been mentioned prior to or at the time of plaintiff's agreement with the defendants, nor was there any evidence whatever that either plaintiff or the defendants contemplated that Smith-Barney would act in the capacity of broker, or in any other capacity except that of a purchaser. Plaintiff

had nothing whatever to do with the activities of Smith-Barney at any time and was not responsible for anything which that firm did or attempted to do.

Defendants' charge of illegality starts with the erroneous assumption that plaintiff agreed with defendants that Smith-Barney would do everything that was actually done by that firm, and defendants then argue that the agreement was therefore tainted with illegality. We have seen that the premise is erroneous.

It is well settled that if a contract can be performed legally, it will not be presumed that the parties intended for it to be performed in an illegal manner, and it will not be declared void merely because it was performed in an illegal manner. (*Vagim* v. *Brown*, 63 Cal.App.2d 504 [146 P.2d 923]; *Dougherty* v. *Cross*, 65 Cal.App.2d 687 [151 P.2d 654]; *Gardiner* v. *Burket*, 3 Cal.App.2d 666 [40 P.2d 279]; 12 Cal.Jur.2d 272; 12 Am.Jur. 647; 17 C.J.S. 545.) Under the facts found by the court and the applicable principles of law the conclusion that the contract did not call for the performance of any illegal act was clearly a correct one.

The next phase of the question arises from the claim that plaintiff is claiming compensation for services for which he was required to be licensed, namely, offering the property of the defendants for sale and negotiating for a sale of it. Although this contention is advanced with much vigor, we are of the opinion that it is without merit. In the first place, plaintiff had done everything that he was required to do when he brought about the introduction of Lee. That constituted performance on his part, and it is that performance and nothing else for which he seeks compensation. If he did more than that it was not in performance of anything that he had undertaken to do or was required to do in order to earn his compensation. He is not suing for compensation earned as a result of his efforts in effecting a sale, but claims it solely on the basis of his introduction of Lee and the results of the efforts of Smith-Barney. Even if he had engaged in some activity that was not required of him, and which was wholly apart from the full performance of his agreement, this would not be a defense against liability of the defendants to him for the full performance of a valid agreement in a lawful manner. But aside from this, we are unable to see that plaintiff engaged in any activity which, as a matter of law, amounted to the rendition of services, or acting in the capacity of a broker.

A "Broker" as defined by section 25006, Corporations Code, "includes every person or company, other than an agent, who, in this State, engages either wholly or in part in the business of selling, offering for sale, negotiating for the sale of, or otherwise dealing in, any security issued by others," etc. As defined by section 25009 "(a) 'Sale' or 'sell' includes every disposition, or attempt to dispose, of a security or interest in a security for value. 'Sale' or 'sell' includes all of the following, whether done directly or by an agent, circular letter, advertisement, or otherwise: An offer to sell; an attempt to sell; a solicitation of a sale; . . ."

It is not questioned by plaintiff that a single transaction for compensation as thus defined would constitute engaging in business "in part."

Defendants say that if a person takes even a slight part in the negotiations for the sale of property he is acting as a broker, and they list the following activities of plaintiff: "(1) Attended meeting at which initial negotiations between Lee and appellants took place. (2) Loaned automobile to Lee for his use in inspecting Jergins Oil Co. property. (3) Took Lee to Long Beach to inspect Jergins Trust Building and confer with company officials. (4) Brought Lee back from Long Beach and discussed Jergins Trust Building and 'the deal.' (5) Met with Lee at least twice thereafter and discussed 'the deal.' (6) Took Lee to railroad station and discussed status of transaction. (7) Played golf with Hill of Chase National Bank accompanied by Barten of Smith, Barney & Co., during their negotiations with appellants."

The court found that plaintiff did not agree to do, or do, anything which would bring him within the above definition of "broker." Defendants assail this finding, contending it is contrary to all the evidence. They quote at length from *Rhode* v. *Bartholomew*, 94 Cal.App.2d 272 [210 P.2d 768], in which it was held that it appeared as a matter of law that the activities of the unlicensed plaintiff in negotiating a sale of corporate stock brought him within the statutory definition of a broker and necessitated reversal of a judgment in his favor for a commission. Defendants take a few facts from that opinion and some of the acts of plaintiff, Freeman, and contend that the facts of the two cases are substantially the same. This is not so. In the cited case Rhode alleged in his complaint that he was promised a commission for finding a purchaser and "assisting in the sale" and that he negotiated with the principals in respect to the sale and

purchase, although these allegations were retracted by amendment of the complaint. The court said (pp. 279-280) : ''Unquestionably, respondent offered the stock for sale. He attempted to dispose of it. He attempted to sell it. He solicited a sale of the stock by appellants. These acts were sufficient to bring him within the terms of the act. We think also that he negotiated for the sale of the stock. He treated with others with a view to sale of the stock, which is negotiating.'' In the present case Freeman had only a vague idea that the company might be acquired for 35 or 40 million dollars and advised Lee to that effect. He expressed the opinion to Lee that it was a good company and inquired as to the progress of the investigations that were being made. Being a former Georgian, he extended courtesies to Lee, arranged a cocktail party with members of his own family, at which only Atlanta affairs were discussed, drove Lee here and there and loaned him a car. He also played golf with Mr. Hill. All this took place, as previously mentioned, after he had done everything that was expected of him. Both he and Troutman were country club acquaintances, respectively, of Jergins and Lee. They exhausted their usefulness when they brought about the latter's introduction to defendants, and they were ignored in the negotiations. Neither plaintiff nor Troutman had anything to offer the highly competent and experienced men who had the business in hand. Mr. Jergins testified that he and Stanley and Cotton together handled all the negotiations with Lee and Barten, that plaintiff was never present at any of the meetings and that he, Jergins, at no time had anything to do with plaintiff after the discussions respecting an introduction and the matter of compensation. There was abundant evidence that plaintiff agreed to do and did nothing to bring about a sale except arrange an introduction.

Jergins, but not Stanley or Cotton, makes the final argument under the claim of illegality that even if plaintiff did nothing more than introduce Lee to defendants, this would have been offering defendants' property for sale and negotiating for a sale, or, in other words, acting as a broker. He says there is no such thing as a ''finder'' as distinguished from a ''broker.'' He concedes that the same contention was expressly rejected in *Shaffer* v. *Beinhorn*, 190 Cal. 569 [213 P. 960], *McKenna* v. *Edwards*, 19 Cal.App.2d 327 [65 P.2d 810], and *Crofoot* v. *Spivak*, 113 Cal.App.2d 146 [248 P.2d 45], but contends the cases were incorrectly decided.

The Shaffer case arose under the Real Estate Brokers Act (Stats. 1919, p. 1252). A real estate broker was then defined as "a person, copartnership or corporation who, for a compensation, sells, or offers for sale, buys, or offers to buy, or negotiates the purchase or sale or exchange of real estate," etc. The court said (p. 573): "In order to come within the definition of real estate broker or real estate salesman a party must 'sell or offer to sell, buy or offer to buy, or negotiate the purchase or sale or exchange of real estate . . .' By the terms of their contract as pleaded the plaintiffs were only required 'to find' or 'to introduce' to defendant a person 'interested' in purchasing and who subsequently did purchase, in order to recover the sum agreed by the defendant to be paid to them. By the terms of the contract, as set forth in the complaint, the 'negotiation' of the sale was to be left entirely to defendants. Plaintiffs' only duty was to produce a prospective purchaser. . . . The acts of plaintiffs, therefore, as alleged in the complaint fall short of those defined by the Real Estate Brokers Act as constituting either a real estate broker or real estate salesman."

In the McKenna case the plaintiff had arranged a conference as a result of which the owners of corporate stock sold a part of it to persons produced by plaintiff. It was held that the plaintiff was not a broker as defined by subdivision 10 of § 2 of the Corporate Securities Act (Stats. 1933, p. 2308), since she did nothing other than arrange a conference between the parties. The term "broker" was then defined as it is defined by section 25006, Corporations Code. The court squarely held that one who merely introduces an owner of securities and a prospective purchaser is not engaging "either wholly or in part in the business of selling, offering for sale, negotiating for the sale of, or otherwise dealing in, any security issued by others. . . ." The words "sale" and "sell" were then defined as including "every disposition, or attempt to dispose, of a security or interest in a security for value." The court therefore held that an introduction of an owner and a purchaser was not an attempt to dispose of a security. The same words are defined by section 25009, Corporations Code, as including "an offer to sell; an attempt to sell; a solicitation of a sale; an option of sale; a contract of sale;" etc. In the consideration of the question now before us we draw no distinction between the phrase "attempt to dispose of" as used in the 1933 Act and "an offer to sell; an attempt to sell; a solicitation of a sale;" etc. If the former

phrase did not include the mere introduction of an owner and a prospective purchaser as amounting to a "sale" neither does the definition of the word contained in section 25009, Corporations Code. In fact the phrase "attempt to dispose of" is indeed broad and all inclusive.

In the Crofoot case plaintiff had merely arranged an introduction of a prospective purchaser to whom defendant sold real estate. The court stated that the case was controlled by the decision in *Shaffer* v. *Beinhorn,* 190 Cal. 569, *supra.* It was held that the plaintiff was not acting as a real estate broker as the term is defined by section 10131, Business and Professions Code, or as a business opportunity broker, as defined by section 10252 of that code. The court said: "As pointedly observed by the trial judge in his memorandum opinion, no license is required for the simple act of introducing one person to another—yet." The court further remarked that since the decision of the Shaffer case in 1923, the Legislature had not changed the definition of a broker, so as to include within the scope of the term one whose only activity is the introduction of an owner and a prospective buyer, and the court said: "Under such circumstances we think it clear that the Legislature has acquiesced in the interpretation of the statute as given and that no justification could be found for any different interpretation now."

Appellant Jergins criticizes this decision for the reason that the court did not quote the definition of broker which was considered in the earlier case, which we have already quoted, and he says the court evidently did not take into consideration the change that was made in the definition by Statutes 1929, page 223. A real estate broker was defined in that act as "a person, copartnership or corporation who, for a compensation, sells or offers for sale, buys, or offers to buy, lists, or solicits for prospective purchasers, or negotiates the purchase or sale or exchange of real estate," etc. The criticism is unwarranted. The court referred generally to the amendments after 1919 and said that none had been made "which would change the scope of the Legislature's definition of who was a real estate broker as that definition was contained in the act current at the time the Supreme Court made its decision." The only change was the addition of the words "lists, or solicits for prospective purchasers . . ." The clear holding of the court was that in adding those words the Legislature did not intend them to mean the same as "introduces an owner and a prospective purchaser."

The present case cannot be distinguished from Shaffer, McKenna or Crofoot on the ground that Freeman was to be paid only if defendants made a sale through persons he introduced. The same condition was present in each of the earlier cases.

Defendant Jergins says these cases were not well considered and that the holdings in *Hooper* v. *Mayfield*, 114 Cal.App.2d 802 [251 P.2d 330], and *Rhode* v. *Bartholomew*, 94 Cal.App.2d 272, *supra*, are directly to the contrary. He says that in these two cases "the thin distinction between broker and finders was emphatically rejected." In this he is mistaken. In *Hooper* v. *Mayfield* the plaintiff was a broker without a written contract of employment. His contention was that he merely brought the parties together and therefore did not need a written contract of employment—an obviously untenable position. The court merely refused to draw a distinction between a broker who merely introduces the parties and one who is employed to negotiate and conclude a sale, so as to enable the former to recover compensation without a written contract of employment. *Rhode* v. *Bartholomew*, as we have pointed out, was not a case in which the plaintiff had merely brought the parties together. The court emphasized the fact that Rhode had done precisely what the statute says an unlicensed person may not do. Had the court been of the opinion that a mere finder is required to have a license a statement to that effect would have completely refuted the plaintiff's contention.

Although we have already written more than should be necessary on the point there is another important phase to discuss. ■ The finding of the trial court in the present case that plaintiff did not agree to render, or render, any services as a broker is a finding that he did not sell, offer for sale, negotiate for the sale of or otherwise deal in any security. (§ 25006.) It is a finding that he did not agree to make or make an offer to sell or an attempt to sell, and that he did not solicit a sale of the Jergins Company stock. (§ 25009.)

We are asked to reject these findings as wholly unsupported by the evidence for the reason that the introduction arranged by plaintiff amounted to one or more of the acts which are forbidden to unlicensed persons. ■ Reduced to essentials plaintiff's activities consisted of inquiring of three owners, including Jergins, whether their properties were for sale. No price was quoted to him by Jergins or Cotton or Stanley. He merely learned that a sale was possible and so informed Lee.

The question whether such inquiries amounted to a solicitation of a sale of securities or negotiating for or dealing in securities was in the present case one of fact. Spoken or written words cannot in all cases be given the same meaning. The circumstances under which they are spoken or written, the relations of the parties, their purpose, and their understanding of the meaning of the words, all must be considered, and their significance may be a matter of inference. ■ If a broker at the request of a customer seeks out an owner of a security his customer wishes to buy, and obtains a consent to sell and a price, it would doubtless be said that he was negotiating for or dealing in a security. Clearly it would be an activity which was subject to regulation. Upon the other hand if a mutual friend brings together one who owns a security and one who may desire to buy it, or who has a friend who might buy it, it does not result, as a matter of law, that the intermediary was negotiating for or dealing in securities, or soliciting a sale of them even though he expected to be paid for his trouble.

It would be impossible for the Legislature to anticipate all the different conditions under which a business transaction might be initiated, and to enumerate all the activities which might constitute an attempt to sell or a solicitation of a sale. The latitude in which the trier of fact may act cannot be taken away by the mere definitions of words of broad meaning and uncertain application. The factual conclusions which the court drew upon this phase of the case are fully justified by the evidence. In our opinion they decide questions of fact which the Legislature has left for decision by the courts in doubtful cases and they also reflect a correct understanding of the applicable law.

From the time of the earliest legislation of real estate brokers and securities brokers, the Legislature has refrained from extending the regulations to those persons who do no more than arrange an introduction between an owner and a prospective purchaser. The laws pertaining to real estate brokers and securities brokers have been revised or amended at nearly every session of the Legislature since 1917. (See Legislative History under § 25006 and § 25009, Corp. Code, and, §10131, Bus. & Prof. Code.) ■ During all this time when the question has arisen the courts have uniformly held that the act of arranging an introduction between an owner and a purchaser has not been made the subject of regulation by the Legislature. It is to be presumed that the Legislature

has been familiar with the court decisions. We are asked to hold that all those decisions have been in error, or that the Legislature has by some devious and subtle means declared what could at any time have been simply stated, and is conspicuous by reason of its omission, namely, that the term "broker" includes in all cases any person who brings about an introduction of an owner of real estate or securities and a prospective buyer of the same. We agree with the former decisions. They construe a broad principle of legislative policy. The question here is the exact one they decided. They cannot be distinguished in principle. They hold, and we hold, that if the Legislature had ever intended the law to be as appellant Jergins contends it is, there would long ago have been an unmistakable declaration to that effect.

We mention here that able and earnest counsel for appellants Cotton and Stanley do not join in the contention of Jergins last discussed. They contend only that plaintiff's agreement necessarily required the performance of unlawful acts, and that he did far more than merely arrange an introduction, both of which contentions have been answered.

We may add that we do not fear that adherence to former decisions will, as appellant Jergins warns us, turn loose "rascals" and "scamps" upon the "gullible securities owner" and make it easy for them to sell a "credulous widow" stock in a "salted gold mine." The Legislature has not discovered the existence of such dire conditions, nor do we believe they are foreshadowed by the business dealings between the highly proficient defendants and the inexperienced Mr. Freeman. No harm will come from the enforcement of contracts such as they entered into.

Defendants challenge the finding that the sale to Lehman Brothers resulted from the introduction of Lee to defendants and the efforts of Lee and Smith-Barney. The point makes it necessary to set forth additional facts. After the failure of the negotiations with Signal, the authority of Smith-Barney was terminated by defendants and much of the data received from defendants was returned to Stanley, but the firm and Chase National Bank still retained extensive data and the reports that had been made. Lehman Brothers, learning of the situation, went to Chase National Bank and then to Smith-Barney and received the reports on the properties, with supporting data. Lehman Brothers engaged the services of Smith-Barney for the purpose of obtaining defendants' consent to consider a bid for the property and to present it. In view of

uncertainty as to future tax legislation it was understood that any bid would have to be submitted in time for action to be taken by December 29, 1950. Mr. Barten came to California on behalf of Lehman Brothers in December, and with considerable difficulty persuaded defendants to consider a bid. With the assistance of one Rosenberg, a local representative of Lehman Brothers, a bid was submitted and was accepted by defendants.

Defendants contend that the idea of a purchase originated with Lehman Brothers, that Smith-Barney had been discharged by defendants, did not submit the property to Lehman Brothers, and that therefore the sale was not effected through any efforts on its part. The cases cited by defendants upon this point state the familiar rule that in order to earn a commission the broker must be the predominating effective cause of the sale .(see *Nelson* v. *Mayer,* 101 Cal.App.2d 733 [226 P.2d 20], and cases cited). Plaintiff replies that it was not necessary to prove that his efforts were the procuring cause; it was only necessary to prove that the sale was "effected through the efforts of said Lee or the said firm of Smith, Barney & Co.," and that there was sufficient evidence to support the finding. If there is a distinction between effecting a sale through one's efforts and being the procuring cause of the sale, we are unable to recognize it. And the distinction, if one exists, would. be without a difference. The finding, given a construction consistent with the judgment, means that the efforts of Lee and Smith-Barney were the procuring cause of the sale. The fact that Lehman Brothers came to Smith-Barney without solicitation is immaterial. The fact that the latter firm had been discharged is not important. It is not claiming a commission. There is no doubt as to the applicable rule of law. The question under discussion is one of fact, as to whether the sale was effected through the efforts of the persons introduced by plaintiff. If there was substantial evidence to support the finding we, of course, are bound by it. (*Sessions* v. *Pacific Imp. Co.,* 57 Cal.App. 1, 18 [206 P. 653]; *Bail* v. *Glantz,* 78 Cal.App. 49 [248 P. 258]; *Jones* v. *Foster,* 116 Cal.App. 102 [2 P.2d 582].) It was through the efforts of Smith-Barney that reports were made for that company and Chase National Bank. Those reports and all information on hand were furnished to Lehman Brothers. The court found that the latter's bid was based solely on the reports and data furnished by Chase National Bank and Smith-Barney. It was Barten who, as representative of Lehman

Brothers, prevailed upon defendants to entertain the offer. Lehman Brothers did not deal with defendants except through Smith-Barney, and the latter received through Lehman Brothers for services rendered $180,000 cash and 3,200 shares of stock of the corporations which took title to the Jergins Company stock. Certainly Lehman Brothers was satisfied that the sale resulted from the efforts of Smith-Barney, and we do not see how the court could have found otherwise. But for the reports the firm made and supplied, the knowledge it had acquired and its active and effective assistance, Lehman Brothers, so far as shown by the evidence, would never have come into contact with defendants and there would have been no sale. The finding has ample support in the evidence.

During Troutman's cross-examination numerous letters which passed between himself and plaintiff were admitted as evidence. Upon request plaintiff's counsel produced six letters written by Troutman to plaintiff after the completion of the sale, which he said related "roughly" to the transaction. They had been produced in response to a subpoena duces tecum. Defense counsel requested an opportunity to inspect them for possible use in cross-examination. Plaintiff's counsel objected upon the general ground that they were written after the deal was closed and were incompetent, irrelevant and immaterial. Upon request of defense counsel the letters were handed to the court. After reading them the court sustained the objection. Defense counsel requested that the letters be marked for identification. The court ruled that they would not be marked for identification but that they should remain in the file of plaintiff's counsel. Defense counsel then requested permission to inspect the letters and plaintiff's counsel replied that the request would be taken under consideration. Troutman was recalled for further cross-examination and defense counsel informed the court that inspection of the letters had been refused. Again the court ruled that the letters were inadmissible. They were not marked for identification. The rulings of the court are assigned as error.

The procedure is, within our experience, unprecedented. We understand it to be the invariable practice to permit inspection of writings which are produced under a proper subpoena duces tecum and which, admittedly, relate to the matters in issue. If they are offered in evidence and denied admission they are to be marked for identification. They constitute the record upon which the correctness of the ruling is to be judged. If they are not marked for identification

and filed, they are not a part of the record, even though counsel who produced them is directed to keep them in his file.

The letters were produced by plaintiff's counsel on the argument of the appeal and, as directed by the court, were lodged with the clerk of this court. Plaintiff, asserting that he "has never had anything to hide," offered the letters for the court's inspection and moved for augmentation of the record. Counsel for defendants properly refused to stipulate that the letters be considered by this court as a part of the record on appeal. The procedure in the court below was manifestly in error. Defense counsel desired to read the letters while Troutman was under cross-examination and was denied that privilege. The error is not cured by production of the letters at this time. Defendants properly object to the consideration of the letters. There is no occasion for them to enter into a stipulation which would waive the claim of error.

We have been obliged to read the letters and have ordered them to be filed by the clerk as a part of the record. In no other way can it be determined whether the ruling of the court was seriously prejudicial and we must, of course, rule upon that question. The letters in question are under dates of January 16th and 26th, February 5th, May 29th, July 9th and August 1st of 1951 and were written by Troutman to Freeman. They relate to conversations of Troutman with Lee and report a friendly attitude on the part of Lee, and his belief that Troutman and plaintiff should be compensated for their services; they discuss the matter of depositions and other preparations for trial; they emphasize the necessity of showing that Barten, who had gone over to Lehman Brothers, was acting for Smith-Barney in the Jergins' transaction; they express curiosity as to the compensation received by Lee and Smith-Barney. The letters contain such expressions as "attain our gold (goal), "our position in this matter," "we might accept his offer" (speaking of a possible offer of settlement), "we have no worry"; and in referring to Lee, "he believes that we are entitled to win the case. . . ." These expressions could be construed as indicating a belief on Troutman's part that the promises of the defendants ran in his favor as well as in favor of Freeman, and that they were joint promisees. Upon the other hand Troutman knew that Freeman alone was the plaintiff in the action, and we find in the letters the following: "Mr. Lee told me that he had talked with Mr. Barten and had told him of the controversy between you and Mr. Jergins"; "Mr. Lee told me that he had seen Mr. Barten

in New York three days ago and that Mr. Barten had told him that he did not see how Mr. Jergins could prevent paying for your services and could prevent stating that the deal was completed through the Smith-Barney connection which you provided to Mr. Jergins.'' While the letters show that Troutman regarded the prosecution of the claim as in his interest as well as in the interest of Freeman there was nothing in them contradictory of the fact that he was to receive half of whatever Freeman should receive, and the further fact that defendants' agreement was with Freeman, alone. Other matters were mentioned such as a possible settlement to be arranged through Mr. Cotton, and there were references to other schemes which Troutman and Freeman had in mind.

We are satisfied that defendants suffered no substantial prejudice in being deprived of the use of the letters in the cross-examination of Troutman or in their exclusion as evidence. Troutman was cross-examined at length. The letters contained nothing that was inconsistent with his testimony or that of any other witness for plaintiff. It is difficult, therefore, to account for the contumacious refusal of plaintiff's attorney to allow the letters to be inspected by defense counsel.

By answer defendant Jergins pleaded nonjoinder of parties in that Troutman was not joined as a plaintiff. Defendants Stanley and Cotton also pleaded nonjoinder of parties but did not name anyone who should be joined as a plaintiff or defendant. No motion was made to bring in Troutman or any other person as a party.

The court found: ''Said Robert B. Troutman, Jr., was not a party to the agreement between plaintiff and defendants and had and has no rights thereunder against the defendants, and was and is not a proper or necessary party in said action.'' Defendants contend that Troutman was an indispensable party, or at least a necessary party plaintiff; if he was the first, the court was without jurisdiction to proceed with the action until he was brought in as a party (*Warner* v. *Pacific Tel. & Tel. Co.*, 121 Cal.App.2d 497 [263 P.2d 465]); if the second, it may have been an abuse of discretion not to order him brought in (*Bank of California* v. *Superior Court*, 16 Cal.2d 516 [106 P.2d 879]). They assail the above finding as without support in the evidence. The record does not sustain their contention.

In the initial letter which Troutman wrote to plaintiff he promised plaintiff one-half of any commission he might receive. He did not request plaintiff to make any arrangement under

which either he or plaintiff would receive compensation from the seller if a sale should be made. He was working with Lee as a representative of Smith-Barney and presumably was aware of the fact that that firm would expect to be compensated by the buyers. Before Troutman or Lee came to California plaintiff had discussed with Jergins his connection with Troutman and had shown Jergins communications from the latter. The court found that Jergins informed plaintiff that he would be ". . . interested in having plaintiff find a person or persons who might be interested in, and to or through whom the said defendant might possibly effect, a sale of said properties and in having plaintiff introduce such persons," and that if he could negotiate and effect a sale of the stock he would pay plaintiff a reasonable compensation for the introduction. Plaintiff was the one who was relied upon to arrange the introduction and he was the one to whom the promise was made. When it was learned that compensation might be earned by plaintiff under his agreement with defendants an arrangement was made between plaintiff and Troutman for a division of whatever plaintiff might receive. Defendants were aware of this arrangement but they dealt only with plaintiff. Plaintiff, so far as disclosed by the evidence, could have made any agreement for compensation he wished. Performance of that agreement by defendants would have fulfilled their obligation. Troutman left the matter in the hands of plaintiff. Defendants evidently so understood the matter; they did not consider it necessary to consult Troutman nor did Troutman deem it necessary to discuss the matter with them. Defendants made no promise to Troutman. Thus neither defendants nor Troutman considered it necessary for Troutman to give his consent to any agreement between plaintiff and defendants respecting compensation. Any claim Troutman had was against plaintiff and not defendants. It is true that plaintiff rejected offers of compensation made by defendants, one for $45,000 and the other on a basis that might amount to as much as $72,000, and that he gave as his reason that he would not agree to the offers on behalf of Troutman. It is also true that Jergins stated that the defendants would compensate plaintiff and Troutman, but the court was not required to find from this evidence that Troutman was one of the contracting parties. The court could have regarded plaintiff's attitude in the matter as merely indicating his desire to make an arrangement for compensation which he believed would be satisfactory to Troutman, or as an excuse

for not agreeing to defendants' proposals. We conclude, therefore, that the finding that Troutman was not a party to the contract was fully justified by the evidence.

 This finding disposes of the contention of defendants that Troutman was either an indispensable party or a necessary party to the action. Since defendants' assumption that he was one or the other is in error there is no occasion to discuss the principles of law and procedure which apply in the cases of indispensable or necessary parties to litigation. The fears expressed by defendant Jergins that defendants may be subjected to demands upon them made by Troutman appear to be groundless. One has only to review the case in retrospect to see that any such claim by Troutman would be unfounded. He was present and was a witness during the trial and no suggestion came from him of any claim against the defendants. From the very beginning he left all the arrangements for compensation to plaintiff and the latter was free to make an agreement in which he would be the sole promisee. But whether plaintiff's compensation was for a price agreed upon or for the reasonable value of his services Troutman, having stood by and acquiesced in everything that plaintiff did, could in no event have a claim for more than one-half of whatever plaintiff might receive, and this claim, as we say, would be against plaintiff rather than defendants.

 Defendant Jergins sought to examine Troutman under section 2055, Code of Civil Procedure, as a person for whose immediate benefit the action was prosecuted. Upon objection the court ruled that he was not subject to examination under section 2055. The ruling is assigned as error. Since the rights of Troutman were limited as above set forth and he had no claim upon defendants, the court properly held that he was not a party for whose immediate benefit the action was prosecuted and that he was not subject to examination under section 2055, Code of Civil Procedure. The action was not for the enforcement of any claim of Troutman against the defendants. Defendant Jergins says "we have never contended that Troutman was a third party beneficiary." Defendants Stanley and Cotton do not contend that Troutman was a third party beneficiary. On motion of defendant Cotton the court struck out the testimony of plaintiff as that of a party to the action, and the testimony of Troutman as that of a person in whose behalf the action was prosecuted against the executor of Cotton's estate insofar as the

testimony related to matters or facts occurring before the death of Cotton (Code Civ. Proc., § 1880, subd. (3).) Although this ruling as to the testimony of Troutman was inconsistent with the ruling that he could not be examined under section 2055, Code of Civil Procedure, the inconsistency is immaterial. Since Troutman's testimony was stricken Cotton cannot complain. The ruling barring Troutman's examination was correct as to Jergins since he contends only that Troutman was a joint promisee, and Stanley does not complain of it.

The point is made by Stanley and Cotton that the promise of the defendants to compensate plaintiff for his services insofar as it related to sales of stock controlled but not owned by defendants was void since it was not in writing. A promise to answer for the debt, default or miscarriage of another is invalid unless it is in writing (Civ. Code, § 1624, subd. 2), but it is deemed an original obligation and need not be in writing "Where the promise is upon a consideration beneficial to the promisor, whether moving from either party to the antecedent obligation, or from another person." (Civ. Code, § 2794.) The stockholders, other than defendants, made no promise to plaintiff and had no obligation to him. Defendants did not agree to pay any debt owed to plaintiff by others. It is not questioned that if there was an agreement it was that defendants would compensate plaintiff on the basis of stock they owned and also the stock sold by the several groups which they represented. It was necessary to deliver a controlling stock interest in order to make a sale. Defendants' promise was not without consideration. The court found it to be an original obligation. The finding has ample support in the evidence.

Motions for a new trial were made and denied. The notice of Jergins specified, with other grounds, newly discovered evidence. The supporting affidavits related to the testimony given by one of plaintiff's experts, J. Morris Jackson, and purported to establish that the witness had given false testimony. Jackson valued plaintiff's services at $2\frac{1}{2}$ per cent of $31,000,000 or $775,000, basing his opinion in part upon his own experience and his statement that he had received a commission of $100,000 for negotiating a sale of stock of Roberts Public Markets, Inc., to Fitzsimmons Stores, Ltd., for $1,900,000; he qualified that statement by reducing the amount he had received to $50,000. The affidavits on the motion, supported by documentary evidence,

were to the effect that Jackson had received only $14,000 in the transaction. It may be granted there was a sufficient showing made that Jackson had given false testimony and that his credibility was considerably impaired by the facts stated in the affidavits, but that fact alone would have been an insufficient reason for a new trial. It was for the trial judge to determine whether his finding as to the value of plaintiff's services would have been the same had Jackson testified to the facts revealed in the affidavits, or whether it would have been the same had he known Jackson to be an untrustworthy witness. This is clearly a situation in which the discretion of the trial judge, as exercised, is controlling. The opinions of the experts covered a wide range, namely, $775,000, $503,750, $635,000, $20,000 to $25,000, $20,000 to $30,000, $10,000 to $25,000. The trial court was not impressed by any of these opinions. It is evident that the finding would have been the same had there been no expert testimony. If the opinion of Jackson was deemed worthless, when it was assumed he was a truthful witness, proof that he stretched the facts, as well as his estimate of value, could not have caused the court to think less of his opinion. It is scarcely necessary to add that an order denying a motion for a new trial will not be reversed in the absence of a clear showing of abuse of discretion. There was no abuse of discretion.

We have considered the contention of defendant Cotton that no sufficient claim was presented to him as executor, and find it to be without merit. It is predicated upon the assumption that the oral agreement was invalid since it called for broker's services. We are of the same opinion respecting the contention that the contract sued on was for the sale of goods or choses in action and was required to be in writing. (Civ. Code, §§ 1624a, 1724.)

 Although the court found in favor of plaintiff on the first cause of action, which alleged an express agreement to pay plaintiff a reasonable compensation, and also on the common count, there is no fatal conflict. The findings on the common count will be disregarded insofar as they create a technical conflict. (*Baird* v. *Ocequeda*, 8 Cal.2d 700 [67 P.2d 1055].)

 The final contention of Stanley and Cotton is that it was error to grant a joint judgment against them. We agree. The court found that defendants owned and controlled stock as follows: Jergins 22,499 shares, Cotton 11,769 shares

and Stanley 1,215 shares, and fixed plaintiff's compensation on the basis of the amount paid to defendants, namely 1 per cent of $14,956,084.50 or $149,560.84.

There was no finding that defendants promised jointly to compensate plaintiff. There was a conclusion of law that plaintiff was entitled to recover from the defendants jointly and severally but it is evident from the findings that this conclusion was not intended as a finding of fact. From the evidentiary facts found and the undisputed evidence it clearly appears that the obligation of the defendants was several. The conclusion of law was in error.

The Jergins interests received $9,483,328.50, the Cotton interests $4,960,633.50 and the Stanley interests $512,122.50. The ownership of each group was entirely separate from the ownership of the other groups. Each of the three defendants was present to speak for himself and his own group and did not speak for the other groups. There was a contribution of the several interests to the total, but no promise made by any of the defendants on behalf of the others. Each group sold at a specific price the stock it deposited pursuant to the offer. There was no agreement with plaintiff as to the number of shares that would be deposited nor any agreement to pay him a definite sum. There was no express agreement creating a joint liability and no community of ownership or interest from which it could be inferred that Cotton and Stanley intended to obligate themselves to pay, or were expected to pay more than their proportionate shares of plaintiff's compensation. "Where two or more parties to a contract promise separate performance, to be rendered respectively by each of them, or where each of them makes only a separate promise that the same performance shall be rendered, each is severally bound for the performance which he promises and is not bound jointly with any of the others." (Restatement, Contracts, § 113.) Plaintiff does not question that this is the rule as to a several obligation.

Since the amount of the judgment was fixed upon the basis of the benefits received by the defendants, and the amounts of the several benefits were determined, the judgment should have been against the defendants severally and in accordance with their respective interests.

We deem it appropriate to observe that the findings, instead of being confined to the few ultimate factual issues, consist of nine pages of findings as to meetings, conversations, discussions, telephone calls, statements of many persons, and

the unrelated activities of the parties and numerous participants in the transaction. Even then, as an attempted statement of the important evidentiary facts, it is manifestly incomplete. So we remark again that findings should be confined to the determinative factual issues, and that all else is redundant, confusing and poor practice. Anyone who is uninformed, or in doubt as to the correctness of this statement, would profit by reading law on the subject. (*Anderson* v. *Badger*, 84 Cal.App.2d 736 [191 P.2d 768] ; *Robbins* v. *Holther*, 98 Cal.App.2d 674 [220 P.2d 585] ; *Crummer* v. *Besser Mfg. Co.*, 100 Cal.App.2d 189 [223 P.2d 100] ; *Eggeman* v. *Binford*, 106 Cal.App.2d 556 [235 P.2d 409] ; *Alles* v. *Hipp*, 108 Cal. App.2d 730 [239 P.2d 451] ; *Sanal* v. *Meador*, 108 Cal.App. 2d 820 [239 P.2d 908] ; *Swanson* v. *Wheeler*, 112 Cal.App.2d 43 [245 P.2d 699] ; *Denbo* v. *Senness*, 120 Cal.App.2d 863 [262 P.2d 31].) (See 100 or more cases collected in 24 Cal.Jur., p. 968 et seq. and 10-Yr. Supp.)

The judgment is modified to run against A. T. Jergins for $94,833.29, against the estate of Charles M. Cotton for $49,-606.33 (payable in due course of administration), and against Lowell Stanley for $5,121.22; as modified the judgment is affirmed, plaintiff to have costs against A. T. Jergins; defendants Cotton and Stanley to recover their costs from plaintiff.

Wood (Parker), J., concurred.

VALLÉE, J.—I dissent. I am of the opinion that plaintiff, whether he be called a ''finder,'' an ''introducer,'' or what not, was a broker within the meaning of the Corporate Securities Act and that he was required to have a license. A broker includes every person, other than an agent, who engages either wholly or in part in the business of selling, offering for sale, negotiating for the sale of, or otherwise dealing in, any security issued by others. (Corp. Code, § 25006.) ''Sale'' includes every ''attempt to dispose'' of a security, and it includes ''an attempt to sell'' and ''a solicitation of a sale.'' (Corp. Code, § 25009.) As alleged and found, plaintiff's right to compensation was dependent not merely on his arranging an introduction of Lee to defendants but on the introduction resulting in the sale of the stock through the efforts of Lee or Smith, Barney and Company. If introducing one person to another for a consideration with the avowed purpose of having them negotiate with each other for the

sale of stock, the consideration being contingent on a sale, is not "otherwise dealing in" (as distinguished from "offering for sale" and "negotiating for the sale of"), is not an "attempt to dispose" of the stock, is not "an attempt to sell" the stock, is not "a solicitation of a sale,"—then these phrases are meaningless. "Dealing in" is having to do with, being concerned with, making arrangements for. (Webster's Inter. Dict. 2d ed.) To "attempt" means to endeavor to do a thing. (Idem.) To "solicit" means to endeavor to obtain by asking. (Idem.) To "endeavor" is to strive to achieve. (Idem.) What was plaintiff's purpose in finding a prospective purchaser? He was having to do with, being concerned with, making arrangements for, sale of the stock. He was striving to achieve a sale of the stock; he was attempting to sell it, to dispose of it; he was soliciting a sale. He had no other purpose.

A person whose business it is to bring buyer and seller together is a broker. (*Eaton* v. *Yount,* 48 Cal.App. 221, 224 [191 P. 1009].) The fact that plaintiff had no authority to effect a sale is of no consequence in determining whether he was a broker. (8 Am.Jur. 1011, § 51 et seq.; *Holway* v. *Malloy,* 70 Cal.App.2d 317 [160 P.2d 893]; *Mason* v. *Mazel,* 82 Cal.App.2d 769 [187 P.2d 98].) The duty of a broker, in the absence of an agreement enlarging his duties, is merely to bring the principals together to negotiate with each other for the purpose of making a contract. (12 C.J.S. 10, § 6.)

Under plaintiff's contract his right to compensation was expressly made contingent on the introduction resulting in the sale of the stock through the efforts of Lee or Smith, Barney and Company. Plaintiff approached defendants and inquired whether they were interested in selling their Jergins Oil Company stock, and ascertained that they were interested in doing so. He persuaded Lee to come to California for the purpose of negotiating with defendants with respect to the sale of the stock. He introduced Lee to defendants in California for the purpose of having them negotiate for the sale of the stock. I think it obvious that plaintiff was "otherwise dealing in" a security and that he attempted to dispose of it, attempted to sell it, and solicited the sale of it. The finding that plaintiff did not agree to render, or render any services as a broker is not supported by the evidence. The evidence as to plaintiff's activities is uncontradicted. There is nothing doubtful about the facts. The question whether on the uncontradicted evidence plaintiff was a broker is one of law, not of fact.

Neither *Shaffer* v. *Beinhorn,* 190 Cal. 569 [213 P. 960], nor *McKenna* v. *Edwards,* 19 Cal.App.2d 327 [65 P.2d 810], nor *Crofoot* v. *Spivak,* 113 Cal.App.2d 146 [248 P.2d 45], decides the question in this case. Shaffer construed the Real Estate Brokers' Act of 1919 which defined a real estate broker as a person who, for compensation, sells, or offers for sale, buys, or offers to buy, or negotiates the purchase or sale or exchange of real estate. The 1919 act did not define the word "sale" and it did not contain the phrases "otherwise dealing in," "attempt to dispose," "attempt to sell," or "solicitation of a sale." McKenna arose under the Corporate Securities Act as amended in 1933. (Stats. 1933, p. 2308.) The court relied entirely on the definition of a broker and on *Shaffer* v. *Beinhorn.* At that time the definition of "sale" read substantially the same as it did in 1949 when plaintiff made the contract, but the court gave no consideration whatever to the effect of the phrases "attempt to dispose," "attempt to sell," or "solicitation of a sale." Neither the definition of a sale nor these phrases were mentioned in the opinion. The decision was premised solely on the fact that the plaintiff did not negotiate the sale of stock. The Crofoot case arose under the Real Estate Brokers' Act as it existed in 1948. The court merely followed *Shaffer* v. *Beinhorn,* saying that since it was decided the Legislature had made "no amendments to the pertinent language of the enactment which would change the scope of the Legislature's definition of who was a real estate broker as that definition was contained in the act current at the time the Supreme Court made its decision." The Real Estate Brokers' Act did not then nor does it now contain a definition of "sale," as does the Corporate Securities Act. (Bus. & Prof. Code, §§ 10130-10221.) The court overlooked entirely the 1929 amendment to the Real Estate Brokers' Act which broadened the definition of a real estate broker to include one who does a single act for a compensation of "listing or soliciting prospective purchasers." (Stats. 1929, ch. 130, § 2; Bus. & Prof. Code, § 10134.)

I am also of the opinion that the purchase by Lehman Brothers was not effected through the efforts of either Lee or Smith, Barney and Company. I agree that Troutman was not an indispensable or necessary party; that the contract was several; that there was no prejudicial error in refusing to permit Jergins to examine Troutman under section 2055 of the Code of Civil Procedure; that defendants' promise was not to answer for the debt, default, or miscarriage of another;

that it was error not to mark the Troutman letters for identification, but that defendants suffered no substantial prejudice in not being able to use them; that the newly discovered evidence did not compel the granting of a new trial; and that the findings are a hodgepodge.

A petition for a rehearing was denied June 14, 1954, and appellants' petition for a hearing by the Supreme Court was denied July 21, 1954. Traynor, J., and Spence, J., were of the opinion that the petition should be granted.