[Civ. No. 38180. Second Dist., Div. Five. Mar. 21, 1972.]

MICHAEL SHORE, Plaintiff and Appellant, v.
COMMERCIAL BANKERS LIFE INSURANCE COMPANY, Defendant and Respondent.

## COUNSEL

Staitman & Snyder and Jack M. Staitman for Plaintiff and Appellant.

Luckham, Fenton & Lieber and Fred C. Fenton for Defendant and Respondent.

## OPINION

**KAUS, P.J.**—Plaintiff Michael Shore appeals from a judgment in favor of the defendant Commercial Bankers Life Insurance Company ("Commercial"). The appeal has merit and the judgment must be reversed.

### FACTS

This is a most refreshing case in that, on sharply conflicting evidence, the trial court found all the relevant facts in plaintiff's favor, but held against him solely on a point of law. We shall therefore only relate that aspect of the evidence which supports the findings of fact.

In 1965 plaintiff had discussions with officers of Commercial concerning the possibility that Coastal Union, an agent, would place health and accident insurance which it was then writing through another carrier, with Commercial. Plaintiff was assured that if he was successful in his efforts he would be "adequately compensated." He brought the principals together

and eventually Coastal Union placed business with Commercial which resulted in premiums of about four million dollars. Plaintiff then broached the subject of his compensation. He was first offered a vice presidency with Commercial, with a salary and stock options. He declined.[1] Eventually the negotiations culminated in an agreement that he would be paid an "override" equal to 2 percent of the net paid premium. This understanding was memorialized in a letter dated March 2, 1966,[2] from Commercial's executive vice president and secretary:

"This is to confirm the previous oral understanding which we have had regarding your override commission on A & H business submitted to us via the COASTAL UNION Agencies.

"Commencing at the date of first submitted A & H business by this group, we shall pay you an override equal to 2% of net paid premium. This override shall be computed and paid to you on a calendar quarter basis.

"As soon as we have had an opportunity to complete our year-end work, the figures in this connection will be brought to date and their remittance will be forthcoming."

This agreement was eventually disavowed by Commercial.[3]

The Coastal Union business was a disaster and Commercial lost "in excess of a million and a half" as a result of it.

From these facts the court concluded: 1. the services performed by plaintiff were "past" consideration for Commercial's later promise to pay the 2 percent override, and that before the March 2, 1966 agreement Commercial was not legally bound to pay plaintiff anything; and 2. plaintiff's services, viewed as "moral consideration," proved to be of no benefit to the corporation and the promise of the 2 percent override was therefore not enforceable. (Cf. *Desny* v. *Wilder*, 46 Cal.2d 715, 738 [299 P.2d 257].)[4]

---

[1]Plaintiff was not in the insurance business. However at some undetermined time, at the encouragement of Commercial, he successfully took an examination for an "insurance license."

[2]Although the agreement was evidently reached some time before March 2, 1966, we shall, for the sake of simplicity, refer to it from time to time as the "March 2, 1966" agreement or contract.

[3]Commercial offered evidence to the effect that plaintiff was never offered any compensation before the Coastal Union business was secured, that the motivation for his efforts was a desire to increase the value of 68,000 shares he owned in the parent company of Commercial, and that the executive vice president and secretary who wrote the March 2, 1966 letter to plaintiff acted outside of the scope of his authority. As noted earlier, all factual conflicts were resolved in plaintiff's favor.

[4]The court's reasoning is expressed in the formal findings and conclusions. Their interpretation is aided by the minute orders announcing the court's intended decision

## Discussion

■ Plaintiff raises several alleged procedural errors in addition to his basic contention that, on the facts proved and found to be true, he was entitled to enforce the agreement as embodied in the letter of March 2, 1966. Since we agree with him on the last point, we need not discuss the other problems raised which will not reoccur during the limited retrial ordered in our disposition of the case.

As indicated, the trial court based its denial of any relief on two premises: 1. that the services performed were "past consideration" for the promise of March 2, 1966; and 2. that plaintiff's services had no reasonable value, since defendant lost money on the business plaintiff procured. We must disagree on both counts.

It is clear that the trial court used the term "past consideration" in the sense that defendant was under no legal obligation of any kind to compensate plaintiff when the March 2, 1966 letter was written. This simply was not so. As the court itself expressly found—on conflicting evidence, to be sure—plaintiff was promised adequate compensation before he ever undertook to act. When his mission was successfully completed he clearly had a cause of action for adequate compensation. (*Murdock* v. *Murdock*, 7 Cal. 511, 514; *Freeman* v. *Jergins*, 125 Cal.App.2d 536, 541 [271 P.2d 210].) All that was necessary was for the parties, or, if they could not agree, for a court or jury to fix the amount of compensation at a definite figure. (Civ. Code, § 1611; *Cook* v. *Thomson*, 230 Cal.App.2d 866, 868 [41 Cal. Rptr. 323].) Thus when the later negotiations resulted in the agreement memorialized by the March 2, 1966 letter, defendant most definitely promised to compensate plaintiff for services for which defendant was already bound to pay him. The only problem with the preexisting obligation was that it had not been reduced to a dollars and cents figure and that, obviously, reasonable men could differ with respect to that figure.

Nor can we accept the proposition that plaintiff's services were of no benefit to defendant. Indeed defendant never took that position before or at the outset of the trial. The issue whether the Coastal Union business was profitable was injected into the case by a question asked by the court near the end of the testimony of defendant's principal witness, its president and later chairman of the board, one Maurice M. Shaw.

The Coastal Union business generated several million dollars of premiums. In paying and accepting these premiums the insureds as well as

---

and denying plaintiff's motion for a new trial. These were not made part of the record on appeal, but were inspected by us pursuant to rule 12 (a) of the California Rules of Court.

■

defendant took a chance: the former that the cost of accidents and sicknesses during the policy periods would prove to be less than the premiums paid, the latter that it would have to pay out more on account of such costs than the net premium income paid.[5] But how does this concern plaintiff? There is not a hint in the record that his compensation was to be geared to the profitability of the risks assumed with respect to Coastal Union business. Just as plaintiff could never have asserted more than reasonable compensation for his services even if the Coastal Union business had been spectacularly profitable, so defendant cannot point to its losses to defeat any claim which plaintiff otherwise has.

The judgment awarding plaintiff nothing obviously cannot stand. However, since the proper measure of damages will be an issue at the retrial, we must address ourselves to it.

There are two possible alternatives. The first is that plaintiff is entitled to recover the exact amount which will result from an application of the formula specified in the March 2, 1966 letter.[6] The other is that plaintiff is only entitled to the reasonable value of his services.[7]

On the face of it it seems quite clear that the March 2, 1966, formula represents a compromise with respect to the value of an unliquidated claim. In fact what we have here is a classical example of an accord. Speaking of compromises of unliquidated claims, Professor Corbin (6 Corbin on Contracts, § 1290) recognizes seven different classes of such agreements. The type involved herein the very first:

"(1) The amount of the plaintiff's original claim may never have been determined either by agreement of the parties or otherwise. Thus, where A

[5]Our knowledge of the economics of the health and accident insurance business is somewhere between nonexistent and rudimentary. We realize, of course, that because of overhead expenses the insurance company may suffer a loss even if the total of valid claims is less than the premium income. We realize also that this overhead factor is at least partly offset by the fact that usually the company has the use of premium income for some time before it goes to pay claimants. None of these facts were canvassed at the trial. We simply have Mr. Shaw's statement that a loss of a million and a half resulted from the business.

[6]There is enough in the present record to indicate that there may be problems of interpretation and application of that formula. Since the trial court decided to award plaintiff nothing, it never had to face these problems; nor are they argued by the parties before us. In the absence of an adversary presentation of the issues relating to the application of the March 2, 1966 formula, we refrain from delivering any guidelines with respect thereto.

[7]We assume that value to be less than the amount which would be generated by an application of the March 22, 1966 formula. It may, in fact, be higher; however, plaintiff's pleadings ask for no more than a judgment based upon the March 2, 1966 agreement.

has rendered service for B without agreeing in advance upon the compensation to be paid, B is bound to pay a reasonable sum; what this sum may be is a question of fact for court or jury. Prior to judicial determination, no man can say with certainty how much B owes for the service. . . . After final adjudication of the amount, the debt becomes a liquidated debt. It may also be turned into a liquidated debt by mutual agreement of the parties. . . ." (6 Corbin Contracts, ch. 70, § 1290, p. 166.)

Defendant claims that *Herbert* v. *Lankershim,* 9 Cal.2d 409, 477-478 [71 P.2d 220] limits plaintiff to the reasonable value of his services, even if an application of the 2 percent override formula would result in a greater recovery.[8] In that case the plaintiff claimed to have rendered certain services to Colonel Lankershim in his lifetime. Her evidence indicated that on account of such services the Colonel had presented her with a note for $500,000, payable one month after his death. In a suit on the note the defendant offered to prove that the reasonable value of the plaintiff's services was less than $500,000. No testimony on that subject was, however, permitted. This was held to be error on appeal because section 1606 of the Civil Code[9] limits a promise to pay for past services to the reasonable value of such services, whether the obligation to pay for such services is legal or moral.

The *Herbert* case is not in point. There, if the promise contained in the $500,000 note was made, it was a mere promise, not as in the case at bar the bargained for consideration for a return promise on the part of the promisee that the promisee's unliquidated claim was to be compromised at the promised amount. If the *Herbert* case really stands for the proposition contended for, a compromise which is designed to avoid litigation concerning the reasonable value of services would have no such effect, since the obligor could always claim that the compromise figure is merely a ceiling on his obligation which is still to be measured by the very methods which the compromise seeks to avoid.

## DISPOSITION

The issues whether plaintiff's services were rendered gratuitously or after a promise of adequate compensation and whether the March 2, 1966 agreement was authorized by defendant were hotly contested at the first

---

[8]This argument, as presented in defendant's brief, naturally is coupled with an assertion that, in view of defendant's losses, the reasonable value of plaintiff's services was zero.

[9]"An existing legal obligation resting upon the promisor, or a moral obligation originating in some benefit conferred upon the promisor, or prejudice suffered by the promisee, is also a good consideration for a promise, to an extent corresponding with the extent of the obligation, but no further or otherwise."

trial. The court found against defendant on those issues; no useful purpose would be served in retrying them. The retrial shall therefore be confined to issues concerning the proper interpretation of the March 2, 1966 agreement[10] and the ascertainment of the precise amount of damages based upon such interpretation.

The judgment is reversed and the case is remanded to the superior court for proceedings not inconsistent with this opinion.

Aiso, J., and Reppy, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied May 18, 1972.

---

[10]There appears to be an issue concerning the extent, in point of time, of the promise to pay the 2 percent override. There may also be an issue concerning the proper meaning of the term "net paid premium."