[Civ. No. 57014. Second Dist., Div. Two. May 15, 1980.]

ALLAN F. ZALK, Plaintiff and Respondent, v.
GENERAL EXPLORATION COMPANY, Defendant and Appellant.

**COUNSEL**

Munger, Tolles & Rickershauser, Melvyn H. Wald and Rita J. Miller for Defendant and Appellant.

Wadsworth, Fraser & Dahl and Edgar L. Fraser for Plaintiff and Respondent.

**OPINION**

**FLEMING, J.**—Zalk obtained judgment against General Exploration Company (GEX) for $212,200 for services rendered. GEX has appealed. We affirm.

The evidence, summarized in the light most favorable to the judgment (*Gyerman v. United States Lines Co.* (1972) 7 Cal.3d 488, 492 [102 Cal.Rptr. 795, 498 P.2d 1043]; *Peterson v. Grieger, Inc.* (1961) 57 Cal.2d 43, 51-52 [17 Cal.Rptr. 828, 367 P.2d 420]), showed that for 10 years Zalk traveled throughout the United States inspecting mining properties and accumulating a list of properties and companies which

could be acquired and operated profitably. In 1971 he sought to find an organization interested in employing him on a regular basis to acquire properties. Ultimately, he came in touch with GEX, a California corporation active in coal, gas, oil, and related energy fields, and interested in making acquisitions.

In November 1971 Zalk met Ward MacDonald, president of GEX, and William Ferguson, chairman of the board of GEX, and proposed the following terms of employment: Zalk would resign as an officer of the company with which he was then connected (Tennekol Energy Company) and turn over to GEX the list of mining properties he had inspected and evaluated between 1961 and 1971. Zalk would devote his full time as a finder for GEX; he would be compensated only in the event of a successful acquisition of a property or company he found and brought to GEX's attention. GEX would furnish him an office, secretarial assistance, a telephone credit card, and air transportation. Zalk would pay his other travel expenses, such as hotels, meals, and ground transportation. In the event of a successful acquisition he would be reimbursed by payment of a finder's fee, which would take the form of a consultant contract with GEX for 10 years at $3,000 a month ($360,000). According to Zalk, that same day MacDonald telephoned to say he had discussed the proposed terms of employment with Ferguson and Robert Rhodes, a director of GEX, and they had approved the arrangement. According to GEX, it did not accept Zalk's consultant proposal, but it told him to start work and agreed to pay him a reasonable finder's fee. Thus, according to the versions of both parties, they agreed that Zalk would devote his full time and attention to finding properties for GEX in return for compensation in the event of a successful acquisition.

Zalk worked for GEX approximately 18 months (Nov. 1971 to May 1973). During the course of his employment he traveled throughout the United States, inspecting about 35 properties and meeting officers and stockholders of various companies GEX might be interested in acquiring. Zalk also performed other services for GEX, such as introducing GEX to merger prospects, arranging bank loans, and securing foreign letters of credit. During his 18 months, with GEX Zalk spent $15,000 of his own money for hotels, meals, and other travel expenses.

In January and February 1972 Zalk made a trip to Kentucky and West Virginia to inspect various properties for GEX. Sometime during

the course of this trip he spoke over the telephone about coal properties to Marion Horn, a stockbroker in Lexington, Kentucky, interested in coal-mining properties. In April 1972 Horn in Kentucky telephoned Zalk at GEX headquarters in California to say he had an option to purchase five affiliated companies, known as the Greer Companies, headquartered in Kentucky and engaged in the highway construction and earth-moving business. Specifically, Horn said the Greer companies were for sale, he had an option to purchase them for $11 million, and he had a commitment for a loan of $10 million to finance their purchase. Horn outlined the Greer companies' sales, profits and losses, and book value of assets. Zalk immediately told MacDonald the Greer companies were for sale. MacDonald, in turn, relayed this information to Ferguson in Columbus, Ohio, who, after making certain inquiries, reported back that the Greer Companies were not for sale. Zalk then telephoned Horn, who again assured Zalk the companies were for sale. (In point of fact Horn, a financial adviser and personal friend of Elmo Greer (president of the Greer Companies), had been commissioned by Greer to find a buyer for the Greer Companies. To assist Horn in this activity Greer had given Horn an option to purchase the Greer Companies for $10 million, which option, however, had expired in Jan. 1972.) Zalk relayed his second conversation with Horn to MacDonald and gave him and Ferguson the telephone numbers of Horn and Greer. Ferguson telephoned Horn, and shortly thereafter Ferguson, MacDonald, and Horn met in Columbus, Ohio, where Horn produced copies of the Greer financial statements and discussed proposed terms of sale. In May 1972 Ferguson, MacDonald, and counsel for GEX, met the Greer principals and Horn in London, Kentucky, and started to negotiate for the purchase of the Greer Companies. GEX continued negotiations during the remainder of 1972, and in March 1973 it executed a letter of intent to purchase the Greer Companies. Zalk did not participate in any of the negotiations. On 4 May 1974 GEX consummated the purchase of the Greer Companies for $13,722,000.

On May 1, 1974, Zalk filed this action against GEX to recover the reasonable value of his services. The trial court found that on November 10, 1971, Zalk and GEX entered an oral contract of employment, and thereafter Zalk furnished GEX with information which led to negotiations with the Greer principals for the acquisition of the Greer Companies. By letter of September 1, 1972, MacDonald, president of GEX, acknowledged that Zalk had been the finder of the Greer Companies and would be entitled to a finder's fee if GEX ultimately

acquired these companies.[1] The court, using the standard Lehman formula for calculation of finder's fees,[2] fixed the reasonable value of Zalk's services as $237,200, from which it deducted $25,000 paid by GEX to Horn as reimbursement for out-of-pocket expenses and assistance in the negotiations. Judgment was entered for Zalk for $212,200.

On appeal, GEX principally contends that Zalk was not entitled to a finder's fee, because he did not actually introduce the GEX principals to the Greer principals. More specifically, GEX asserts Zalk merely found another finder, Horn, and therefore did not become entitled to compensation from GEX.

We are not impressed by GEX's contention. Even if we assume that Zalk was a mere common law finder, the trial court specifically found that Zalk was not required by his oral contract with GEX to introduce the principals of GEX to the principals of the Greer companies. Gener-

[1]"September 1, 1972

"Mr. Edward F. S. Bowlby
Roger Mortimer & Co.
241 Salisbury House
London Wall,
London, EC 2M 5QU
England

"Dear Edward:

"This letter is to introduce Mr. Allan F. Zalk.

"Mr. Zalk is retired from the steel supply business, and for a number of years has been an independent consultant specializing in acquisitions and mergers. Our arrangement with Allan is one where he uses our office facilities in his search for acquisitions for General Exploration Company. *At the present time we are working seriously on a very large acquisition that he brought to us. Should this acquisition be accomplished, he would then receive a finder's fee, et cetera.*

"Allan is very imaginative, and has many good contacts throughout the United States. My understanding is that his London trip is primarily vacation-oriented; however, he did want to meet with and see a few people in financial circles.

"Hope things are coming well with you and your organization.

"Sincerely,

"GENERAL EXPLORATION COMPANY

/s/ Ward
J. Ward MacDonald
President" (Italics added.)

[2]The Lehman formula calculates a finder's fee on the basis of 5 percent of the first million dollars of purchase price, 4 percent of the second million, 3 percent of the third million, 2 percent of the fourth million, and 1 percent of the remainder.

ally, a finder's duties are limited to bringing the parties together for the sale and purchase of a business or property, or for the lending and borrowing of money. Once they are brought into contact, the parties negotiate their own contract without the finder's assistance. (*Tyrone* v. *Kelley* (1973) 9 Cal.3d 1, 8-9 [106 Cal.Rptr. 761, 507 P.2d 65]; *Evans* v. *Riverside Internat. Raceway* (1965) 237 Cal.App.2d 666, 675-76 [47 Cal.Rptr. 187].) At bench, GEX cites no cases, nor are we aware of any, in which a finder was denied compensation for services, merely because he failed to physically introduce the buyer's principals to the seller's principals. To the contrary, the holding in the leading case of *Freeman* v. *Jergins* (1954) 125 Cal.App.2d 536, 554 [271 P.2d 210], is directly at variance with GEX's contention. There, Freeman (the finder) introduced Jergins (the seller of the business) to Smith-Barney (a finder) employed and paid by Lehman Brothers (the buyer). The court held that Freeman was entitled to recover a finder's fee from Jergins.

At bench, the propriety of payment for finder's services of this sort was expressly recognized by Ferguson, chairman of the board of GEX, who, when asked whether other finders traditionally introduce the purchasers to the principals of the seller, replied: "It can go any number of ways. But they will typically introduce—will have a client who says, 'we are interested in acquiring a company...' and their function is to get those people together. They sometimes perform the negotiations. They sometime participate. They sometime do just background analysis." The fact that Zalk furnished information which permitted GEX to meet the Greer principals and begin negotiations for the purchase of the Greer Companies was sufficient under the terms of his agreement to entitle him to a finder's fee. The trial court concluded that Zalk's services were the procuring cause of the acquisition in that they set in motion a chain of events which led without material interruption to the acquisition. (See *Freeman* v. *Jergins, supra* (1954) 125 Cal.App.2d 536, at pp. 553-555; *Bail* v. *Glantz* (1926) 78 Cal.App. 49, 53 [248 P. 258].) In our view the trial court's conclusion was fully supported by the evidence.

Moreover above and beyond those considerations, Zalk's right to recover from GEX for services was not circumscribed by general rules which limit the right of a common law finder to recover a fee. Zalk was not the usual free-agent, common law finder, at liberty to present his find to whomever he selected, even to stimulate competition among prospective acquirers. Such a finder is in business for himself, and owes no obligation to any principal. He deals with a prospective acquirer, or seller, or borrower, or lender, at arms length, and he remains free to ac-

cept by performance an acquirer's offer to pay for a find or to reject the offer by nonperformance and deal with another. Zalk's situation was quite different, in that he was a full-time employee of GEX, furnished with an office, telephone, secretarial assistance, and costs of air transportation in order to further GEX's acquisition program. While his remuneration was contingent, nevertheless as an employee of GEX he was bound to act in its interest—in the same fashion that a lawyer who agrees to represent a client for a contingent fee becomes the employee and agent of his client and becomes legally bound to act in his client's interest. The difference in status between a common law finder and an employee-agent employed to search for acquisitions is the difference between a middleman and an agent. (*Anderson* v. *Thacher* (1946) 76 Cal. App.2d 50, 67 [172 P.2d 533]; *Evans* v. *Riverside Internat. Raceway* (1965) 237 Cal.App.2d 666, 676 [47 Cal.Rptr. 187].) The middleman falls under no obligation to others, and he may act solely to further his own best interests. As the court said in *Tyrone* v. *Kelley* (1973) 9 Cal.3d 1, 12 [106 Cal.Rptr. 761, 507 P.2d 65], "Neither considerations of competency nor of trust are of importance where the undertaking is merely to seek out, locate, find and introduce a buyer, seller, borrower, or lender to his counterpart..." Because the middleman, or common law finder, remains free to peddle his find to the highest bidder, strict compliance with the conditions of an offer to pay a finder's fee serves the useful purpose of preventing volunteers from injecting themselves into a pending business deal in order to claim fees for unwanted and useless services. (Cf. *Pass* v. *Industrial Asphalt of Cal. Inc.* (1966) 239 Cal.App.2d 776, 781-783 [49 Cal.Rptr. 190].) ■ In sharp contrast to the position of a common law finder, an agent exclusively employed by a principal to seek out acquisitions stands in a confidential relationship to his principal and owes him an individual duty of loyalty. He is a fiduciary, held to the standard of loyalty and honesty of a trustee (Civ. Code, § 2322; *Langford* v. *Thomas* (1926) 200 Cal. 192, 196-197 [252 P. 602]; *Batson* v. *Strehlow* (1968) 68 Cal.2d 662, 674 [68 Cal.Rptr. 589, 441 P.2d 101].) An agent cannot act on behalf of a person whose interests are adverse to, or in competition with, those of his principal (Rest.2d Agency, § 394; *Rezos* v. *Zahm & Nagel Co.* (1926) 78 Cal. App. 728 [246 P. 564].) His duty of loyalty is the same, regardless of the form of his compensation, whether certain, contingent, or gratuitous. (*Spector* v. *Miller* (1962) 199 Cal.App.2d 87, 95 [18 Cal.Rptr. 426].)

■ At bench, the parties were contractually bound to one another as agent and principal—Zalk to bring to GEX's attention every pros-

pect of the sort for which it was looking and GEX to compensate Zalk in the event any such prospect led to an acquisition. ■ Our construction of the contract accords with the parties' own construction during the period of Zalk's employment; and contemporáneous construction of a contract by the parties provides persuasive evidence of what the parties intended when they made their bargain. (*Crestview Cemetery Assn.* v. *Dieden* (1960) 54 Cal.2d 744, 752-754 [8 Cal.Rptr. 427, 356 P.2d 171]; *Universal Sales Corp.* v. *Cal. etc. Mfg. Co.* (1942) 20 Cal.2d 751, 761-762 [128 P.2d 665].) During the 18 months Zalk was employed by GEX, he was prohibited from violating his contract of employment by acting contrary to GEX's interest. If during that period Zalk had found a particularly choice prospective acquisition, he could not have bargained with another company for a better deal for the disclosure of his find, nor could he have organized a syndicate of his own to acquire it without giving GEX the first refusal. (*Batson* v. *Strehlow* (1968) 68 Cal.2d 662, 675 [68 Cal.Rptr. 589, 441 P.2d 101].) ■ In reciprocal fashion, GEX as employer-principal was bound to compensate its employee-agent for any acquisition which resulted from his activities or disclosures. Its duty to compensate Zalk remained in force, even though acquisition negotiations stretched out over a period of two years and even though GEX made no further use of Zalk's services. (*Chamberlain* v. *Abeles* (1948) 88 Cal.App.2d 291, 296 [198 P.2d 927]; *Miller* v. *Webb* (1963) 217 Cal.App.2d 36, 40 [31 Cal.Rptr. 521].)

On appeal, GEX also complains that the trial court's award of damages greatly exceeded the reasonable value of Zalk's services. ■ But assessment of damages is peculiarly a function of the trier of fact, and, absent a plain abuse of discretion, its assessment will not be disturbed on appeal. (*Bertero* v. *National General Corp.* (1974) 13 Cal.3d 43, 61 [118 Cal.Rptr. 184, 529 P.2d 608, 65 A.L.R.3d 878]; *Kurland* v. *Simmons* (1954) 126 Cal.App.2d 79, 82 [271 P.2d 553].) Not only do we find no abuse of discretion here, but we concur wholeheartedly in the trial court's evaluation of damages.

The final point in the briefs involves Zalk's claim for prejudgment interest. As noted earlier, the acquisition became effective on May 4, 1974, and judgment in favor of Zalk was entered on July 21, 1978. Zalk asserts he is entitled to prejudgment interest from the date of acquisition by reason of Civil Code section 3287, subdivision (b), which provides that the successful claimant of an unliquidated claim for damages based on a cause of action in contract may recover prejudgment

interest, as the court in its discretion may fix. At bench, the trial court concluded that because Zalk's claim was in quantum meruit, it had no authority to award prejudgment interest. We think this conclusion erroneous, in that the cause of action had a consensual basis and, as discussed earlier, was grounded on the specific agreement of the parties. As such, it was a cause of action in contract for an unliquidated claim of damages. We also believe that rejection of the claim by GEX, in the teeth of oral and written evidence of its validity, demonstrated a degree of bad faith on GEX's part sufficiently egregious to warrant a discretionary award of prejudgment interest. Were the matter properly before us we would be inclined to modify the judgment to provide prejudgment interest from date of acquisition (May 1974) to date of judgment (July 1978). However, we believe the procedural posture of the cause precludes us from making such an award. Zalk did not appeal the judgment and thus did not formally bring before us his claim for prejudgment interest. The issue first surfaced when Zalk filed a respondent's brief some 17 months after the appeal had been initiated. We do not believe as substantial an issue as a claim for $60,000 in interest, can be injected into an appeal in such a casual and belated fashion. While formal assignments of error are a thing of the past, nevertheless a respondent has a duty to indicate his dissatisfaction with the judgment from which his opponent has appealed and to give timely notice that he, too, will attack the judgment in one or more particulars. We think the rule in Code of Civil Procedure section 906, which states that a reviewing court is not authorized to review any decision from which an appeal might have been taken but was not, applies to a denial of prejudgment interest. We reach this conclusion reluctantly, in view of the current gross disparity between commercial and legal rates of interest, a disparity which makes dilatory and frivolous appeals profitable. The remedy, however, lies with the Legislature, which we invite to address this issue.

The judgment is affirmed.

Roth, P. J., and Compton, J., concurred.