[No. G004740. Fourth Dist., Div. Three. Apr. 26, 1989.]

L. DALE WATSON, Plaintiff and Appellant, v.
WOOD DIMENSION, INC., Defendant and Appellant.

[Opinion certified for partial publication.[1]]

___

[1] Pursuant to California Rules of Court, rule 976(b), parts II, IV and V of this opinion are not published as they do not meet the standards for publication.

**COUNSEL**

Stern & Miller, Stern, Neubauer, Greenwald & Pauley and Russell F. Wolpert for Plaintiff and Appellant.

Marjorie G. Fuller for Defendant and Appellant.

OPINION

**SONENSHINE, J.**—Wood Dimension, Inc. (WDI), appeals an adverse judgment awarding L. Dale Watson $155,955.85 in damages plus interest, costs and attorney fees. WDI claims the court relied on an improper referee's report, erroneously awarded commissions on sales made after Watson's termination, failed to allow opposition evidence after presentation of the referee's report, and abused its discretion in the award of attorney fees. Watson appeals the amount of the judgment, requesting we enlarge the award.

I

WDI manufactures stereo speakers for resale by sound system companies. A major customer for several years, Fisher Corporation was an enormous asset, its orders accounting for 30 to 50 percent of WDI's business. Fisher ceased purchasing from WDI in early 1982. The loss was a serious financial detriment for WDI; regaining Fisher as a customer, which it was unable to do by itself, was of vital importance.

Gene Hedlund, president of WDI, and L. Dale Watson had known each other for many years. In early 1983, Hedlund's desire to reacquire Fisher's business surfaced in conversation with Watson. Watson was socially acquainted with Ira Horon, Fisher's general manager and vice president.

The possibility arose of utilizing Watson's relationship with Horon to reacquire Fisher's business. WDI might indeed double its production if Fisher were to require the same volume of components as it had earlier.

Realizing the potential if Watson were successful, WDI originally offered him 5 percent of all Fisher orders. However, as conceded by the parties, they eventually orally agreed upon a 3 percent commission.

WDI and Watson were unable to agree on specific terms for a written version of their agreement, in particular the termination provision. When Hedlund announced, "I wouldn't cheat you out of your commission—Let's shake hands," they did just that and agreed a writing was unnecessary.

Horon came to Palm Springs approximately once a month for relaxation. Watson frequently met him at the airport and joined him for golf and dinner. Pursuant to his agreement with Hedlund, Watson was to maintain these activities, generally wining and dining Horon with a view to introducing him to Hedlund at the propitious moment. All went well and, in April, the realliance was cemented; Fisher again became a customer of WDI.

Watson continued to entertain Horon and to collect his 3 percent commission on Fisher orders through 1983.

In early 1984, WDI unilaterally attempted to reduce Watson's commission to 2 percent and, on May 15, Watson was summarily terminated. Watson's friendship with Horon endured until the latter's death in January 1985; his commissions did not. Fisher continued to place orders with WDI, accounting for almost $10 million in business to WDI through July 1985.

Watson filed a complaint for damages based on oral contract, open book account, quantum meruit, and fraud. At trial, the court indicated it would probably be necessary to appoint a referee to assess the voluminous accounting records should a determination of commissions due after date of termination become necessary. Evidence was presented on liability first, although the court later announced it would not rule on the issue until after receipt of the referee's report. Extensive argument ensued concerning the "cutoff" date applicable for payment of commissions to Watson. The court ordered additional briefing and set another hearing date.

Thereafter, the court appointed Judicial Arbitration Service to examine the relevant documents and to make specified determinations.[2] Watson had compiled, from the WDI invoices, a listing of all Fisher invoices from April 1983 through July 1985, including total dollar amounts, commissions due to Watson, and amounts received against those totals. Hedlund objected to those documents being included in the referee's "packet." The court stated, "Then I'll revise my ruling. Just provide the invoices and the other records which you have produced to the referee."

The referee held a hearing, examined the records and produced his report, which embraced the summaries presented by Watson. He found $241,314.34 due and owing to Watson through July 15, 1985. This amount was the cumulative total of the monthly commissions payable to Watson beginning on the date of his termination.

Following receipt of the referee's report, the court entertained argument, accepted a further brief from WDI, and took the matter under submission. In its statement of decision, the court awarded Watson $155,955.84, the

---

[2] The minute order requested findings on the following questions: "#1—Amount which would be due based on a three percent commission on the orders placed by Fisher with Wood Dimension regardless of when paid, on the date of termination and at each thirty days thereafter.

"#2—The amount which would be due based on a three percent commission if commission were due, on the date paid, on the date of termination and on each thirty days thereafter."

amount appearing on the referee's report as cumulative commissions due as of December 15, 1984. The court found the parties agreed to an employment relationship requiring Watson to "regain the previously lost Fisher account for [WDI] in exchange for 3 percent of the sales." The attempt to reduce their arrangement to writing, the failure to agree on termination provisions, and the eventual "handshake" treatment of the dilemma were outlined. The court then stated: "Absent an agreement on termination and attendant compensation, the Court has concluded that under the circumstances of this case, plaintiff is entitled to the reasonable value of the services he performed." The statement noted there was no discussion of reduction of the percent to be paid, the length of time the commission would be paid, or when it would be paid, i.e., "on orders placed, orders shipped or orders paid. The only testimony bearing on the subject was to the effect that orders were anticipated by defendants up to four months prior to receipt."

In determining the reasonable value of Watson's services, the court weighed the factors favoring each party. It then concluded awarding commissions through December 15, 1984, provided Watson "with reasonable compensation for placing the account with Wood Dimension and yet does not compensate him beyond a point when he could no longer influence placement of the account." WDI's motion for new trial was denied.

## II*

· · · · · · · · · · · · · · · · · ·

## III

There is no dispute the parties had a valid oral agreement for a 3 percent commission to Watson on all Fisher orders. However, there was no meeting of the minds regarding compensation at the time of a cessation of Watson's relationship with WDI; because they could not agree on a termination plan, they essentially ignored the possibility. When the possibility became a reality, there was no formula for terminating the right to commissions as well as the employment.

WDI objects to any award of commissions based on sales made to Fisher after Watson's termination. Watson argues because he was the procuring cause of the Fisher involvement with WDI, he is essentially entitled to commissions for the life of that relationship. Recognizing the inequity inherent in either extreme, the court balanced the factors favoring each party

---

*See footnote 1, *ante,* page 1359.

and awarded posttermination commissions for a reasonable period of time based on quantum meruit.

■ ■ ■ ■ ■ Although California sanctions the payment of commissions, after termination and pursuant to an oral agreement where the salesperson is the procuring cause of a *particular* sale,[5] we are not cited to a California case dealing with the precise issue presented here. Watson was not the usual commissioned salesperson; he did not solicit customers or place orders for specific products. His value to WDI was his relationship with Horon and the possibility of reacquiring and maintaining the lucrative Fisher business. Thus, it is the business relationship in its entirety which Watson delivered to WDI, not merely one or more orders.

Federal appellate courts have relied on quantum meruit to find that one who procures an ongoing business relationship, as opposed to single order transactions, is entitled to compensation for a "reasonable" time after termination. In *U.S. Controls Corp.* v. *Windle* (7th Cir. 1975) 509 F.2d 909, Windle met with two other men, Rose and Schantz, to discuss forming a new business. Windle had important connections at Whirlpool Corporation to whom he introduced the other two men. Rose and Schantz incorporated U.S. Controls and, without notice to Windle, eventually designed and marketed an item desired by Whirlpool and for which it issued purchase orders. The court awarded Windle reasonable compensation for his earlier services on the basis of quantum meruit. Because the majority of the U.S. Controls business was furnishing its products to Whirlpool, the court examined the profits over a period of time and awarded 2½ percent of those profits for two years. The reviewing court agreed the majority of U.S. Control's business arose from "initial contacts and introductions" made by Windle; and Windle was entitled to reasonable compensation for his services. "Further, the trial court limited Windle's compensation to the sales for the first two years. This appears to have been a reasonable cutoff date, although Controls had additional sales . . . ." (*Id.,* at p. 912.)

In *Richer* v. *Khoury Bros., Inc.* (7th Cir. 1965) 341 F.2d 34, the court determined "[p]laintiff as the procuring cause of the sales, under the agreement of the parties . . . [was] entitled to commissions notwithstanding the fact that the sales were made or consummated subsequent to the termination of the plaintiff's services." (*Id.,* at p. 38.) There, plaintiff induced certain mail order companies to insert descriptions of his employer's furni-

---

[5] "The question of whether an agent is the procuring cause of a sale is a question for the trier of fact." (*Chamberlain* v. *Abeles* (1948) 88 Cal.App.2d 291, 297 [198 P.2d 927].) Here, there is no challenge to the sufficiency of the evidence to support a finding Watson was the "procuring cause" (*LuMetta* v. *U.S. Robotics, Inc.* (9th Cir. 1987) 824 F.2d 768, 770) or the "effective cause" of Fisher's recapture as a valuable customer.

ture and then received commissions on orders from the catalogue. After he had procured advertisements in several yet-to-be issued catalogues, he was terminated. The court found him entitled to commissions through the life of the catalogues.

In each instance, it was necessary to compensate plaintiff for a reasonable period of time beyond his termination or alliance with the defendant. And it mattered not whether the plaintiff personally obtained or "wrote" the orders. That is clearly what the court attempted to accomplish here. It considered the earlier and devastating loss of the Fisher account, WDI's strong desire to reinstate the account and demonstrated inability to do so itself, Watson's relationship with Horon which he used for WDI's advantage, and WDI's realization of over $9 million in new business after Watson delivered the Fisher account. On the other side of the balance was WDI's retention of the account without assistance from Watson coupled with the death of Horon in January 1985, removing his ability to influence Fisher. The court concluded Watson was entitled to compensation after termination until mid-December 1984. We find the quantum meruit standard applied by the court eminently fair.

■ Contrary to WDI's contention, use of the commission totals calculated at 3 percent was not an impermissible use of a contract term for quantum meruit recovery. The court may consider the price agreed upon by the parties "as a criterion in ascertaining the reasonable value of services performed." (*Ferrier* v. *Commercial Steel Corp.* (1956) 142 Cal.App.2d 424, 427 [298 P.2d 555].)

■ Moreover, the *amount* of the damages *relates* to the 3 percent commission agreed upon, but only in the context of what the reasonable value of Watson's services was to WDI for procuring the WDI/Fisher relationship. The reasonable value of those services was not a daily dollar amount for taking Horon golfing—it was the value of the benefit received by WDI. "California law allows evidence of the value of a benefit conferred to prove reasonable value. [Citation.]" (*LuMetta* v. *U.S. Robotics, Inc., supra,* 824 F.2d 768, 770.)[6] And evidence of the benefit to WDI was voluminous—

---

[6] The court specifically announced it was "not following some mechanical or mathematical formula, but attempting to determine what dollar figure constitutes the reasonable value of the services plaintiff performed."

Although the testimony of the WDI principals was in conflict, the anticipated future needs of Fisher were communicated to WDI far in advance of receipt of Fisher's actual purchase orders. As a consequence, there was a "lag time" of many months between Fisher's notice to prepare for an upcoming order and WDI's invoicing and shipment. While not an element of the referee's report, the court considered this factor as well in determining the reasonable compensation due Watson.

regaining and continuing to receive Fisher's business which accounted for up to one-half of WDI's production and almost $10 million through July 1985. "The trial court's decision will be overturned only where there is no substantial evidence in support of the trial court's decision and thus there can be no doubt of its erroneous nature. [Citations.]" (*Tyrone* v. *Kelley* (1973) 9 Cal.3d 1, 7 [106 Cal.Rptr. 761, 507 P.2d 65].)

In *Zalk* v. *General Exploration Co.* (1980) 105 Cal.App.3d 786 [164 Cal.Rptr. 647], the appellant also complained "that the trial court's award of damages greatly exceeded the reasonable value of [plaintiff's] services. But assessment of damages is peculiarly a function of the trier of fact, and, absent a plain abuse of discretion, its assessment will not be disturbed on appeal. [Citations.]" (*Id.,* at p. 794.) There is substantial evidence to support the court's award and we find no abuse of discretion.

## IV, V*

. . . . . . . . . . . . . . . . . . . .

## VI

### *Watson's Appeal* [9]

██ ██ ██ ██ ██ Watson argues he should have been awarded, at a minimum, 3 percent of the orders generated from Fisher through the entire accounting period, i.e., through July 1985, because he was the "procuring cause" of the ongoing relationship established between Fisher and WDI. He suggests we modify the judgment to reflect this amount or, in the alternative, remand the matter to the trial judge and/or a referee for this determination.[10]

---

\* See footnote 1, *ante,* page 1359.

[9] WDI objects to the facial-or procedural validity of Watson's cross-appeal. In particular, the cross-appeal, a single issue, is contained as "Section X" in the respondent's brief rather than under a separate heading. However, "formal assignments of error are a thing of the past . . . [and] a respondent [only] has a duty to indicate his dissatisfaction with the judgment from which his opponent has appealed and to give timely notice that he, too, will attack the judgment in one or more particulars." (*Zalk* v. *General Exploration Co., supra,* 105 Cal.App.3d 786, 795.)

[10] Watson relies upon the following statement by the court at the hearing on WDI's motion for new trial, a year after trial. "Certainly it's not a traditional case in any respect. But probably because of the numbers involved and that you have plaintiff who was retained or at least in some way hired to bring a certain customer to your company. He performed.

As discussed in part III, *ante,* we agree the compensation awarded was reasonable under the circumstances. The trial court strived for a fair determination of the "cutoff" point—that point in time when Watson no longer had any influence over Fisher's procurement policies and Fisher's continued reordering, while set in motion by Watson, would depend upon WDI's product and service.

Judgment affirmed. Each party to bear its own costs.

Scoville, P. J., and Moore, J., concurred.

---

"And in fact the accounting showed that because of that, during the accounting period some $9-million of gross business was brought to the company. In any situation where you have that volume you're going to have substantial commissions involved. And your people want to pay something like 24 or $25,000.

"In weighing all those factors [in the statement of decision] the court was simply trying to come to the reasonable value of the services rendered. I may be off the mark on the reasonable value, but in my view, I'm probably low.

"I think that you look at that line of cases, although not in California, that talk about commissions going on for the life of the contract or the life of the involvement between Fisher—Fisher and Wood Dimensions—I think that the Appellate Court might adopt that line of cases for California. I couldn't find any California case that goes that far. Obviously counsel couldn't either. But certainly the individual is entitled to compensation for the amount of gross business he brought the company.

"So I decided it on the reasonable value of the services rendered, weighing all the factors I thought were brought in. . . . The testimony was very clear that his primary function was to bring back the Fisher contract, and that the company was in dire straits without it."