**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 24-1054**

---

3074 CENTREVILLE LLC; WESTWAY SERVICES GROUP LLC; WESTWAY WORKPLACE LLC; WESTWAY ENTERPRISES LLC; JBM INVESTMENTS LLC; MARK WEBBER,

                    Plaintiffs – Appellees,

          v.

M.A. COHEN & CO., INC.; MICHAEL COHEN,

                    Defendants – Appellants.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Michael Stefan Nachmanoff, District Judge.  (1:23−cv−00860−MSN−IDD)

---

Argued:  November 1, 2024                              Decided:  April 23, 2025

---

Before DIAZ, Chief Judge, and AGEE and BENJAMIN, Circuit Judges.

---

Affirmed in part, reversed in part, and remanded by unpublished opinion.  Judge Benjamin wrote the opinion, in which Chief Judge Diaz and Judge Agee joined.

---

**ARGUED:**  Gabriel Zachiah Doble, DOVEL & LUNER LLP, Santa Monica, California, for Appellants.   Bryan Michael Killian, MORGAN, LEWIS & BOCKIUS, LLP, Washington, D.C., for Appellees.  **ON BRIEF:**  Gregory S. Dovel, DOVEL & LUNER LLP, Santa Monica, California, for Appellants.  Matthew D. Klayman, Philadelphia, Pennsylvania, Colin S. Harris, MORGAN, LEWIS & BOCKIUS LLP, Washington, D.C.,

for Appellees.

———————————

Unpublished opinions are not binding precedent in this circuit.

DEANDREA GIST BENJAMIN, Circuit Judge:

Mark Webber and Michael Cohen have been on-again, off-again business partners since at least the late 1990s. For years, Cohen assisted Webber in securing financing for a commercial real estate venture in reliance on a purported handshake deal. After Webber informed Cohen that he would not receive an equity stake in the venture, Webber sued Cohen for declaratory judgment. Cohen countersued for breach of contract, promissory estoppel, and quantum meruit. Finding no "meeting of the minds" supporting the existence of a contract or "clear and unambiguous promise" on which Cohen could have reasonably relied, we affirm the district court's grant of summary judgment on Cohen's breach of contract and promissory estoppel counterclaims. But, finding genuine disputes of material fact remain on the quantum meruit counterclaim, we vacate the grant of summary judgment on the issue and remand for further proceedings consistent with this opinion.

## I.

## A.

Michael Cohen is a Northwestern Law-educated former real estate lawyer turned real estate broker and advisor. By his own account, Cohen has helped clients resolve "over $3.5 billion of commercial disputes" and close "over $2 billion of commercial real estate loans and sales." J.A. 216, 147–48. Cohen offers brokerage services, for which he typically charges a commission, and real estate advisory services, for which he collects a

monthly retainer, through and on behalf of M.A. Cohen & Co., Inc. ("MACC").[1] *See* J.A. 153, 261–339, 342–82, 845. Cohen's brokerage services involve "[i]ntroducing a borrower and their project to a lender . . . [a]nd assisting in efforts to cause the lender to make a loan to the borrower." J.A. 152. For brokerage services, Cohen charges clients a commission fee based on a set percentage of the closed loan's value. J.A. 151. As described in agreements Cohen reached with nonparties, Cohen's real estate advisory or "consulting" services involve "formulat[ing] strategies and supervis[ing] and participat[ing] in the execution of certain strategies to assist [a] Client with respect to [a] Matter." *See, e.g.*, J.A. 374. For advisory services, Cohen charges clients an initial fee and monthly fees, which are block-billed as a lump sum for the month in question without an itemized list of services performed. *See, e.g.*, J.A. 333–35, 374.

Mark Webber is the chairman of Westway Enterprises, through which he owns and operates a variety of commercial real estate properties.[2] In 2008, Webber purchased a multi-tenant commercial property located at 3074 Centreville Road in Herndon, Virginia ("Herndon property"). Webber intended to develop the Herndon property as a Sensitive Compartmented Information Facility ("SCIF").[3] But Webber's interest in the Herndon

---

[1] Cohen and MACC will be referred to collectively as "Cohen" throughout.

[2] Webber and the LLCs through which he operates his real estate ventures (3074 Centreville LLC, Westway Services Group LLC, Westway Workplace LLC, Westway Enterprises LLC, and JBM Investments LLC) will be referred to collectively as "Webber" throughout.

[3] A SCIF is "[a]n accredited area, room, group of rooms, or installation where sensitive compartmented information may be stored, used, discussed, and/or electronically (Continued)

4

property was subordinate to $26 million of debt held by a partner in the acquisition. With its high vacancy rates and expenses, the Herndon property could not service its debts, and Webber lacked the assets or equity necessary to secure financing for the property.

Webber and Cohen agree that these were the circumstances under which Webber approached Cohen for assistance. They also agree that Cohen performed and was paid for commission fee-based loan brokerage services related to real estate transactions involving the Herndon property and properties in Chantilly, Virginia; San Antonio, Texas; and St. Louis, Missouri. But the parties diverge on whether Webber engaged Cohen to provide any additional services. Webber claims he contracted with Cohen in 2009 for Cohen to provide only commission fee-based loan brokerage services. Cohen maintains that because Webber could not afford to pay Cohen's monthly advisory fees, Webber offered to make him an equity partner in the expansion of Webber's SCIF venture. To that end, Cohen claims that he provided Webber extensive advisory services outside of traditional brokerage services throughout that time, effectively offering his advice on improving the Herndon property and potential acquisitions on an on-call basis. While Webber acknowledges seeking and receiving non-brokerage advice from Cohen, he insists that those interactions were not advisory services.

---

processed, where procedural and physical measures prevent the free access of persons unless they have been formally briefed for the particular sensitive compartmented information authorized for use or storage within the sensitive compartmented information facility." *Sensitive Compartmented Information Facility Use (SCIF) Policy*, Gen. Serv. Admin. (Dec. 14, 2020), https://www.gsa.gov/directives-library/sensitive-compartmented-information-facility-use-scif-policy (https://perma.cc/G73W-3QW9).

Cohen claims that throughout his time working on Webber's SCIF venture, Webber made verbal assurances that Cohen had a 20% equity interest in the venture, thereby forming an oral contract. Cohen also claims that he was repeatedly held out as a partner in the SCIF venture during his and Webber's conversations with lenders. In support of the alleged assurances and purported oral contract, Cohen points to various communications between himself and Webber beginning in 2017. But the various emails and draft agreements, including communications between the parties and their respective attorneys, disagree on the percentage of interest (20% vs. 25%), the nature of the interest (equity vs. debt vs. profit vs. distributable cash), whether the interest was conditioned on Cohen's past or future performance, whether the interest was exclusively in the Herndon property or included other related properties, and assignment rights, among other issues. The parties' communications proceeded as follows:

| April/May 2017 | During a phone call, Cohen and Webber discussed and (and Cohen claims, agreed to) Cohen's owning a 20% equity interest in the LLC that held Webber's interest in the Herndon property. Webber claims he explained over the phone that any agreement would be in writing, and to that end, he retained legal counsel to draft the proposed written agreements. |
|---|---|
| September 28, 2017 | Webber sent Cohen and another consultant, Mike Michaels, a proposed written agreement wherein each would receive 20% equity. In the accompanying email, Webber said he needed to know whether the parties desired to move forward as partners. Cohen instead asked for a profit rather than equity interest. |
| November 27, 2017 | After Michaels declined Webber's offer, Cohen sent Webber a proposal wherein he would receive 25% "net cash flow," rather than an equity stake. |
| December 26, 2017 | Webber proposed that Cohen receive 20% of distributable cash (which was to be computed differently than net cash flow) and conditioned receipt on Cohen brokering a loan and "future services." |

| January 5, 2018 | Cohen responded rejecting the offer with a list of his counsel's concerns. |
|---|---|
| January 29, 2018 | Cohen sent a revised proposed agreement that removed any reference to Cohen's obligation to provide future services. Webber replied that the proposal didn't reflect their recent conversation. |
| February 2, 2018 | Webber sent Cohen a revised proposal that restored Cohen's obligation to provide future services. |
| February 14, 2018 | Cohen sent Webber his own revised proposal. Webber responded that the proposal "in no way covers are [sic] conversation or is the action in which you agreed to take based on our call." |
| May 7, 2018 | Webber sent Cohen a revised proposal again including Cohen's obligation to provide future services, but Cohen refused to sign. |
| July 15, 2018 | Webber wrote to Cohen with an offer explaining his position and making "concessions." Webber agreed that the contract could be for Cohen's "past services only," subject to Cohen receiving no compensation for future services. Cohen rejected that offer. |
| February 13, 2020 | Cohen sent Webber another proposal allegedly "consistent with prior discussions." The draft included comments directing Webber to update the agreement to include new properties Webber acquired since 2018. Webber did not provide any written response. |
| June 26, 2020 | Cohen sent a further revised proposal. Webber again provided no response. |
| May 10, 2022 | Cohen emailed again to discuss completing "[their] agreement that [his] company will receive a 20% profit sharing with respect to real estate assets that you or your affiliates control." |
| May 17, 2022 | Webber responded, calling the May 10 email "inaccurate and a distortion of our communications" and maintaining no agreement existed. |
| May 24, 2022 | Cohen emailed Webber, accusing him of having breached an earlier agreement related to a transaction in 2009 and outlining his view that an oral agreement existed. |
| May 27, 2022 | Webber called the May 24 email inaccurate and again maintained that they "never reached an agreement." |

B.

Webber filed suit against Cohen seeking a declaratory judgment that no contract between them exists, Cohen has no interest in Webber's business, and Webber does not owe any money to Cohen. Cohen filed counterclaims for breach of contract, promissory

7

estoppel, and quantum meruit.  In response, Webber filed for summary judgment on all claims and counterclaims.  The district court granted the motion for summary judgment in its entirety.  Cohen filed this timely appeal.  J.A. 1016.  For the reasons below, we vacate and remand the district court's grant of summary judgment on Cohen's quantum meruit counterclaim but otherwise affirm the district court's decision.

## II.

We review grants of summary judgment "de novo using the same standard applied by the district court."  *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (citation omitted).  "Summary judgment is appropriate only if taking the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party, 'no material facts are disputed and the moving party is entitled to judgment as a matter of law.' "  *Id.* (quoting *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 899 (4th Cir. 2003)).  "A fact is 'material' if proof of its existence or non-existence would affect disposition of the case under applicable law."  *Wai Man Tom v. Hosp. Ventures LLC*, 980 F.3d 1027, 1037 (4th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "An issue of material fact is 'genuine' if the evidence offered is such that a reasonable jury might return a verdict for the non-movant."  *Id.*

Though summary judgment is typically not appropriate "where 'affidavits present conflicting versions of the facts which require credibility determinations,' "  *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016) (quoting *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979)), courts may disregard the nonmoving party's self-serving testimony at

summary judgment if "documentary evidence 'blatantly contradict[s]' [it] 'so that no reasonable jury could believe it.' " *See Witt v. W. Va. State Police*, 633 F.3d 272, 276–77 (4th Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) (first alteration in original)).

## A.

Under California law,[4] a valid contract requires "(1) [p]arties capable of contracting; (2) [t]heir consent; (3) [a] lawful object; and, (4) [a] sufficient cause or consideration." Cal. Civ. Code § 1550 (2025). To be enforceable, a contract "must be definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages." *Bustamante v. Intuit, Inc.*, 45 Cal. Rptr. 3d 692, 699 (Cal. Ct. App. 2006) (first quoting *Ladas v. Cal. State Auto. Ass'n.*, 23 Cal. Rptr. 2d 810, 814–15 (Cal. Ct. App. 1993); then citing *Robinson & Wilson, Inc. v. Stone*, 35 Cal. App. 3d 396, 407 (1973)).

"California law is clear that there is no contract until there has been a meeting of the minds on *all* material points." *Banner Ent., Inc. v. Superior Ct. (Alchemy Filmworks, Inc.)*, 62 Cal. App. 4th 348, 357–58 (1998), *as modified* (Mar. 30, 1998) (collecting cases). "[A] term may be 'material' in one of two ways: It may be a necessary term, without which there can be no contract; or, it may be an important term that affects the value of the bargain. Obviously, omission of the former [but not the latter] would render the contract a nullity." *Facebook, Inc. v. Pac. Nw. Software, Inc.*, 640 F.3d 1034, 1037 (9th Cir. 2011) (citing

---

[4] The parties agree that California law governs Cohen's counterclaims.

*Citizens Utils. Co. v. Wheeler*, 319 P.2d 763, 769–70 (Cal. Ct. App. 1958)). "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Alexander v. Codemasters Grp. Ltd.*, 104 Cal. App. 4th 129, 141 (2002) (citing 1 B.E. Witkin, Summary of Cal. Law, Contracts § 119, at 144 (9th ed. 1987)).

Cohen argues that the parties formed a binding oral agreement in April 2017, which they modified in November 2017, and which the parties' "words, writings, and conduct" continually affirmed over the following years. Webber argues that no such agreement was ever formed for a litany of reasons including, but not limited to, the lack of mutual assent. Even viewed in the light most favorable to Cohen, there was no meeting of the minds in April—or at any other time—as is necessary to form a binding oral contract. Any claim otherwise is contradicted by Webber's email to Cohen and Michaels on September 28, 2017, which read in relevant part,

> I just received the draft agreement for all of us to review. Due to the situation with the current lender <u>I must know whether you desire to move forward with being a partner or not by this weekend.</u> As this agreement does not contemplate any invest [sic] on your part I see no reason to provide any financial information <u>until such time as I have your decision as to whether you desire to become a partner.</u>

J.A. 401 (emphasis added).

As the district court correctly noted, that Webber needed to know whether Michaels <u>and</u> Cohen desired to "move forward with becoming a partner" makes clear that Webber did not understand a binding partnership agreement with Cohen to have arisen from their

10

April conversation. J.A. 899–900. Under an objective standard, Webber's email is an outward manifestation of the *lack* of mutual assent. *See Alexander*, 104 Cal. App. 4th at 141. The email was merely an *offer*. *See Banner*, 62 Cal. App. 4th at 358–59 (citing *Kessinger v. Organic Fertilizers, Inc.*, 151 Cal. App. 2d 741, 750 (1957)) ("Mutual intent is determinative of contract formation because there is no contract unless the parties thereto assent, and they must assent to the same thing, in the same sense.").

Cohen has proffered no evidence of his oral acceptance of Webber's offer. Instead, the record shows that two months later, Cohen sent Webber the first of many redlines with significant changes to the structure of the agreement, division of interests, and Cohen's obligations. *See* J.A. 437. Any reasonable jury would interpret Cohen's response as a rejection of Webber's offer and find no September or November 2017 contract. And because Cohen and Webber did not "agree on the material terms" in April 2017, Cohen's argument that "the initial agreement remains binding and a rejected writing is a nullity" is irrelevant. *See Facebook*, 640 F.3d at 1037; Opening Br. at 31.

Cohen's consideration for the 20% equity interest is also unclear. By his own account, Cohen understood from their April 2017 conversation that his work to close financing for the Herndon property was his consideration. *See* J.A. 647; 845–46, 701. But the draft agreement Webber proposed in September 2017 required Cohen to perform unspecified future work without additional payment. *See* J.A. 402, 415. Whether as consideration Cohen was obligated to continue advising Webber without payment after closing Herndon is *necessary* information to determining whether a breach occurred. *See Bustamante*, 45 Cal. Rptr. 3d at 699 (requiring "sufficiently definite" terms for

11

enforceability under California law).  Because the scope of Cohen's duties under the purported contract is unclear, any alleged 2017 contract would be unenforceable.  *See id*.  Thus, a reasonable trier of fact could not find the existence of a contract, let alone a breach, regardless of Cohen's testimony to the contrary.  Summary judgment was therefore proper.  *See Witt*, 633 F.3d at 276.

## B.

We turn next to Cohen's counterclaim alleging promissory estoppel.  Under California law, "[t]he elements of a promissory estoppel claim are '(1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) [the] reliance must be both reasonable and foreseeable; and (4) the party asserting the estoppel must be injured by his reliance.' "  *Aceves v. U.S. Bank, N.A.*, 120 Cal. Rptr. 3d 507, 514 (2011), *as modified* (Feb. 9, 2011) (second alteration in original) (quoting *Advanced Choices, Inc. v. State Dept. of Health Servs.*, 182 Cal. App. 4th 1661, 1672 (2010)).  A promise is clear and unambiguous if it is

> definite enough that a court can determine the scope of the duty[,] and the limits of performance must be sufficiently defined to provide a rational basis for the assessment of damages. . . . [W]here a supposed contract does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, . . . there is no contract.

*Id.* (first and third alterations in original) (quoting *Garcia v. World Savings, FSB*, 107 Cal. Rptr.3d 683, 696 (Cal. Ct. App. 2010) (cleaned up)).  A party's "misguided belief or guileless action in relying on a statement on which no reasonable person would rely is not justifiable reliance. . . . 'If the conduct of the plaintiff in the light of his own intelligence

12

and information was manifestly unreasonable, . . . he will be denied a recovery.' " *Id.* at 227 (quoting *Kruse v. Bank of Am.*, 202 Cal. App. 3d 38, 54 (1988)).

Cohen argues that "Webber made a clear and unambiguous promise . . . [that] if Cohen succeeded in eliminating the Herndon debt, MACC would receive a 20% equity interest in Webber's business (later modified to a 20% profit participation)." Opening Br. at 55. Webber argues because the contract failed for reasons other than a lack of consideration, the parties' negotiations over the form and amount of interest cannot support promissory estoppel, and no reasonable juror could find Cohen reasonably relied on the alleged promise to his detriment.

As we outlined above, Webber's alleged undocumented promises to provide some indeterminate amount and form of equity was not "a promise clear and unambiguous in its terms." *See Aceves*, 120 Cal. Rptr. 3d at 514. No court could determine the scope of Cohen and Webber's duties to each other from the limited and contradictory evidence proffered here. *Id.* at 226. Any reliance by Cohen, an experienced and successful real estate advisor with substantial legal training was "manifestly unreasonable," not "justifiable reliance." *Id.* at 227. On these facts, not genuinely in dispute, a reasonable trier of fact could not find promissory estoppel. Summary judgment was therefore proper. *See Henry*, 652 F.3d at 531.

### III.

We address the statute of limitations issue and the merits of Cohen's quantum meruit counterclaim in turn.

13

A.

As a threshold matter, Webber argues that Cohen's quantum meruit claim "is time-barred with respect to services provided before April 25, 2021, and it fails as a matter of law with respect to services provided after April 25, 2021, which were subject to the parties' commission fee-based payment arrangement." Response Br. at 56. Cohen responds that "[t]he district court erred in finding MACC's quantum meruit claim time-barred" because the district court mischaracterized the nature of his services to Webber, and under the proper test, the statute of limitations only began to run when Webber repudiated their contract on May 17, 2022. Opening Br. at 24, 48–49, 51. In the alternative, Cohen argues that equitable estoppel precludes Webber's statute of limitations defense. Opening Br. at 52–54.

"Although the statute of limitations on a cause of action for quantum meruit for personal services usually begins to run when those services or the relationship between the parties terminate[,] . . . [w]here services are provided with the understanding that payment for those services will be made at some time after the termination of those services or upon some contingency, the statute of limitations does not begin to run until that time arrives or contingency occurs." *Zakk v. Diesel*, 33 Cal. App. 5th 431, 455 (2019) (citations omitted). Under those conditions, "the Statute of Limitations begins to run from the time the last service is rendered." *Johnstone v. E & J Mfg. Co.*, 114 P.2d 658, 659 (Cal. Dist. Ct. App. 1941) (citing *Corato v. Estate of Corato*, 201 Cal. 155, 159 (1927)). The applicability of a statute of limitations defense is normally a question for the factfinder. *Fox v. Ethicon Endo-Surgery, Inc.*, 110 P.3d 914, 922 (Cal. 2005).

14

Although Cohen is attempting to recover for some services he provided more than two years before filing, a reasonable jury could fairly conclude that Cohen's services were a part of a general, ongoing real estate advisory service for Webber's businesses for which he expected to be fairly compensated down the line. *See Johnstone*, 114 P.2d at 659. Part of the value of Cohen's advisory services to Webber and other clients stemmed from his on-call availability to advise them on various miscellaneous real estate-related matters. *See* J.A. 703–04; *see, e.g.*, J.A. 696–98 (Webber acknowledging asking Cohen for advice outside of brokerage work); J.A. 704–12 (Cohen's list of services to Webber, including scouting and advising on potential acquisitions). At least for clients that weren't Webber, Cohen generally charged a monthly retainer for his advisory services without an itemized list of discrete services performed. *See* J.A. 261–339 (invoices); 342–82 (consulting agreements).

Taken in the light most favorable to Cohen, Cohen initially provided his advisory services based on the promise of partnership in the Herndon SCIF venture to be realized once he secured financing. And as the parties began to negotiate anew in 2017, Cohen continued to provide his services under the expectation that their partnership would be made official at a future date. The statute of limitations for his quantum meruit claim would therefore run from the final date of his services to Webber: May 17, 2022. *See Johnstone*, 114 P.2d at 659 (citing *Corato*, 201 Cal. at 159). Since a reasonable jury could

15

find that the statute of limitations does not bar Cohen's quantum meruit claim, we proceed to the claim's merits.[5]

## B.

"The underlying idea behind quantum meruit is the law's distaste for unjust enrichment." *Maglica v. Maglica*, 66 Cal. App. 4th 442, 449 (1998), *as modified on denial of reh'g* (Sept. 28, 1998). When such unjust enrichment occurs, courts seek to "restore the aggrieved party to his [or her] former position by return of the *thing* or its *equivalent* in money." *See id.* (quoting 1 B.E. Witkin, Summary of California Cal. Law, Contracts § 91, at 122 (9th ed. 1987)). "To recover in quantum meruit, a party need not prove the existence of a contract . . . but it must show the circumstances were such that 'the services were rendered under some understanding or expectation of both parties that compensation therefor was to be made.' " *Chodos v. Borman*, 227 Cal. App. 4th 76, 96 (2014), *as modified on denial of reh'g* (July 9, 2014) (quoting *In re Mumford's Estate*, 160 P. 667, 672 (Cal. 1916) (other citations omitted)).

When determining recovery in quantum meruit cases, the reasonable value of services is "the value of the benefit received." *See Watson v. Wood Dimension, Inc.*, 257 Cal. Rptr. 816, 819 (Cal. Ct. App. 1989). Courts may, but are not required to, "consider the price agreed upon by the parties 'as a criterion in ascertaining the reasonable value of

---

[5] Since we conclude that the statute of limitations does not bar Cohen's quantum meruit claim, we do not address the parties' dispute about the possibility that the doctrine of equitable estoppel forecloses Webber's statute of limitations defense.

services performed.' " *See id.* (quoting *Ferrier v. Com. Steel Corp.*, 298 P.2d 555, 557 (Cal. Dist. Ct. App. 1956)).

Though Webber paid Cohen commission for his brokerage services, Cohen proffered evidence that he performed (and Webber acknowledged requesting at least some) real estate advisory work beyond that of a broker. Webber challenged Cohen's knowledge of the precise dates and hours Cohen spent advising him, J.A. 206–11, but he has never denied that Cohen made himself available "at all hours of the day, seven days a week, and 'would receive calls from Webber in the mornings, during workdays, in the evenings, and on weekends.' " *See* Opening Br. at 10 (quoting J.A. 704, 845). Given that Cohen had separate rates for monthly advisory fees (ranging from $5–40,000) and success fees (typically a commission), a reasonable trier of fact could find Cohen performed supplemental advisory services "under some understanding or expectation of both parties that compensation"—here, some form of equity—"was to be made." *See Chodos*, 227 Cal. App. 4th at 96 (citation omitted). A reasonable trier of fact could also find that Webber received the benefit of Cohen's advisory services without payment, such that he was unjustly enriched by the transaction. *See Maglica*, 66 Cal. App. 4th at 449–50.

It will be the factfinder's duty on remand to determine the extent of any unjust enrichment and to quantify the proper amount, if any, should the claim ultimately prevail. Thus, the grant of summary judgment on Cohen's quantum meruit claim was premature.

IV.

17

For all the foregoing reasons, the judgment of the district court is affirmed in part and reversed in part, and the case is remanded for further proceedings in accordance with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*